JULIA F. PARSONS, as Executrix, etc., of ARTHUR E. PARSONS, and Individually, Plaintiff, v. W. CHARLES LIPE and Another, as Executors, etc., of WILLARD C. LIPE, Deceased, and W. CHARLES LIPE, Individually, Defendants. (Action No. 1.)*

JULIA F. PARSONS, as Executrix, etc., of ARTHUR E. PARSONS, Deceased, and Individually, Plaintiff, v. FIRST TRUST AND DEPOSIT COMPANY, as Executor, etc., of ALEXANDER T. BROWN, Deceased, and Others, Defendants. (Action No. 2.)*

Supreme Court, Special Term, Onondaga County, September 9, 1933.

* Affd., 243 App. Div. 681; motion for reargument denied, Id. 857; affd. by Court of Appeals, without opinion, 269 N. Y. 630.

*H. Duane Bruce* and *H. H. Bruce* [*William S. Andrews* of counsel], for the plaintiff.

*Hiscock, Williams & Cowie* [*Leroy B. Williams* and *Daniel Scanlon* of counsel], for the defendant First Trust and Deposit Company.

*Hancock, Dorr, Kingsley & Shove*, for the defendant Burton B. Parsons, as executor, etc., of Mary L. Brown, deceased.

*Ben Wiles* and *Maurice A. Phelps*, for the defendant Julian S. Brown.

Sмith (E. N.), J. These cases were tried together and where necessary will be distinguished from each other by calling Action No. 1 " the Lipe case " and Action No. 2 "the Brown case." The

Lipe action was commenced about January 26, 1929, and the Brown action about March 4, 1929. In the Lipe case there has been a change of parties defendant occasioned by the death in August, 1929, of W. Charles Lipe, who was a coexecutor with the City Bank Trust Company of the last will and testament of Willard C. Lipe, and by the merger of the City Bank Trust Company with the First Trust and Deposit Company, which is a defendant in this action as executor of the last will and testament of Willard C. Lipe and as executor of the last will and testament of W. Charles Lipe. In the Brown case there has been a change of parties defendant occasioned by the death of the original defendant, Mary L. Brown, and the substitution of Burton B. Parsons as executor of her last will and testament.

These actions were originally tried in the year 1929, at the Onondaga County Special Term, before Mr. Justice Jerome L. Cheney, now deceased. Upon his retirement as a justice of the Supreme Court and his appointment as official referee thereof, the case was stipulated before him as such, but he died before rendering a decision. Upon the trial at the Onondaga June, 1933, Special Term a new record was made.

The actions arise out of certain agreements or contracts entered into on the 2d and 3d days of October, 1923, by and between Alexander T. Brown and Willard C. Lipe on the one hand and Arthur E. Parsons on the other. The parties to these contracts are now dead. Willard C. Lipe died September 4, 1924; Arthur E. Parsons died October 31, 1928, and Alexander T. Brown died February 1, 1929. The actions involve the title to and right to the proceeds of 190 shares of the common capital stock of the Brown-Lipe Gear Company, which title and right to said proceeds hang upon the interpretation of the aforementioned contracts and of the conduct of the parties in reference thereto. The actions were tried together; for the most part the material evidence given in one case is evidence in the other. The issues arise out of the same transactions, and the differentiation is largely with respect to the conduct of the predecessors of the parties defendant in reference to the contracts.

The Brown-Lipe Gear Company was a corporation duly organized under the laws of the State of New York in the year 1895, having an authorized capitalization of 1,500 shares of the par value of $100 each. This capital stock was classified into 500 shares of preferred and 1,000 shares of common stock; the preferred stock was preferred to non-cumulative dividends of two per cent per annum, had no voting rights, but participated with the common stock in dividends and in distribution of assets; the incorporators

of the company were Alexander T. Brown and Willard C. Lipe; they were inventors; the business of the company was the manufacture of transmissions, clutches, controls, etc., for automobiles. The business was successful; its earnings were largely plowed into the business, so that by 1917 the value of the capital stock of the company was upwards of $1,500,000. Mr. Lipe and Mr. Brown owned all of the capital stock.

Arthur E. Parsons was born May 6, 1867; Mr. Lipe was born December 21, 1861; Mr. Brown was born November 21, 1854; so that at the time, October 2 and 3, 1923, when the agreements here involved were entered into, Mr. Brown was approximately sixty-nine years of age, Mr. Lipe approximately sixty-two years of age and Mr. Parsons approximately fifty-six years of age.

Mr. Parsons was admitted to the bar of the State of New York November 22, 1894, and practiced his profession in the city of Syracuse, N. Y., until 1917. He specialized in patent law, was successful, and had acted as attorney for Messrs. Brown and Lipe and the Brown-Lipe Gear Company in reference to patent matters in which it was involved. He was recognized as a man of high character and of ability as a lawyer and had had as his clients, in addition to the Brown-Lipe Gear Company, some of the larger industrial corporations of Syracuse in respect of their patent business. In 1917 he was employed by the Brown-Lipe Gear Company, through the action of the sole owners thereof, Mr. Brown and Mr. Lipe, as general manager of the company, at a salary which during the period involved herein was $25,000 per year. Mr. Brown and Mr. Lipe each personally transferred to him five shares of the common capital stock of the company, retaining to themselves each 495 shares. On January 25, 1917, Mr. Parsons was elected secretary of the company and continued in that office until March 18, 1924; on January 25, 1917, he was elected a director and continued as such down to the time of his death; on January 20, 1920, he was elected treasurer and continued to hold that office, as he did the position of general manager, down to the time of his death. When he took charge of the company the book value of each share of the capital stock was approximately $950 per share; on July 31, 1923, it was $1,774 per share, which indicated an increase in the surplus of the company from $1,277,788 to $2,511,639; this during a period of less than seven years; in 1928 or early in 1929 all of the capital stock of the company was sold for $3,400,000 or $2,266.66 per share.

After Mr. Parsons became manager of the company the activities of Mr. Brown and Mr. Lipe gradually lessened, and in October, 1923, Mr. Parsons was apparently master of the industry and both Mr. Brown and Mr. Lipe has practically retired from active partici-

pation in the management of its affairs; Mr. Brown was president of the company during all this period, and Mr. Lipe was vice-president; the relations between these three men were those of unusual confidence and friendship; we do not know, excepting as we infer from known facts, just what were the reasons which led up to the execution of the agreements of October 2 and 3, 1923; but we do know the ages of the parties; we do know that after Mr. Parsons assumed the management of the company Mr. Brown and Mr. Lipe gradually lessened their activities until finally they had practically ceased; we do know that these gentlemen were getting along in years, and we can infer that they were desirous of disposing of their interests in the company, or at least of assuring themselves and those who were to come after them in the event of their death of the continuity of administration under Mr. Parsons. In January, 1923, Mr. Lipe had suffered a paralytic stroke; he went to the Crouse-Irving Hospital in Syracuse for three months; then to Florida until June of that year; then back to the hospital in Syracuse; then to Atlantic City for the summer; then to Battle Creek Sanitarium, staying there until the following spring; then to a sanitarium outside of Washington, where he died September 4, 1924.

Under such circumstances the three parties signed the contract of October 2, 1923. This agreement (Exhibit 1), which was signed by Mr. Lipe at Atlantic City, New Jersey, reads as follows:

"*For one dollar and other good and valuable considerations*, .by each of the undersigned, Alexander T. Brown, Willard C. Lipe and Arthur E. Parsons, all of Syracuse, New York, to the others in hand paid, the receipt of which is hereby severally acknowledged, it is jointly and severally agreed as follows:

"1. *With the approval and authorization of said Brown and Lipe*, said Parsons *agrees* to use his best endeavor to arrange for the early purchase and sale of the preferred and common stock of said Brown and Lipe, in the Brown-Lipe Gear Company, a New York corporation, having a place of business at Syracuse, New York, at a price equalling or exceeding $1,550.00 per share.

"2. Said Brown and Lipe severally agree to pay said Parsons upon the completion of said sale 5% of the cash or other considerations received by said Brown and Lipe respectively, that is each pays 5% of the consideration received by him. It is agreed that providing for any reason such sale is not completed, then said Brown and Lipe are not obligated to make any payment to said Parsons.

"3. Said Parsons *agrees to, and hereby does, purchase* from each said Brown and Lipe, and said Brown and Lipe, *each agrees to, and*

*hereby does, sell and assign and agrees to promptly transfer on the books of said Brown-Lipe Gear Company to said Parsons,* ninety-five (95) shares of their common stock of said Brown-Lipe Gear Company (ninety-five from Brown and ninety-five from Lipe) at the price of $1,472.50 ($1,550.00 less 5%) per share to be paid by said Parsons as follows:

" (a) Upon each payment of a cash dividend to said Parsons, upon each of said two lots of 95 shares of said stock, Parsons will promptly pay to each said Brown and Lipe in cash one-half of the aggregate amount of said dividend on said 190 shares of stock, until said stock is fully paid for.

" (b) Said Parsons shall be free to make such additional payments as he may desire to make from time to time.

" (c) Providing said two lots of 95 shares of said stock is sold, or the title thereto in any way impaired, by said Parsons, then the entire balance due in payment on and for said stock shall forthwith become due and payable.

" (d) All payments by said Parsons on said stock shall be made one-half to said Brown and one-half to said Lipe.

" 4. It is understood that the above price of $1,550.00 per share is approximately three-quarters of, or less, than the present book value of said stock and that the book value is conservative.

" It is agreed that this is an instrument of the State of New York, *and that it binds the heirs, legal representatives* and assigns of the parties hereto.

" Dated at Syracuse, New York, this 2d day of October, 1923.

" ALEX. T. BROWN   (L. S.)
" WILLARD C. LIPE   (L. S.)
" ARTHUR E. PARSONS (L. S.)

The instrument was duly acknowledged; there were triplicate originals, each party retaining possession of one thereof.

The parties subsequently signed another instrument, dated October 3, 1923 (Exhibit 2), which reads as follows:

" This agreement made the 3d day of October, 1923, between Alexander T. Brown, Willard C. Lipe and Arthur E. Parsons, all of Syracuse, New York, supplementing their agreement of October 2, 1923, regarding the sale of Brown-Lipe Gear Company stock, for value received,

" Witnesseth, That at any time after January 1, 1924, the said Alexander T. Brown and Willard C. Lipe, or either of them, by written notice to said Arthur E. Parsons, may cancel their said agreement of October 2, 1923, and said agreement shall on the service of such written notice terminate and be of no further effect

*excepting the third provision thereof relating to the sale of ninety-five (95) shares of stock by each of them to said Arthur E. Parsons which shall remain in full force and effect.*

"ALEX. T. BROWN　(L. S.)
"WILLARD C. LIPE　(L. S.)
"ARTHUR E. PARSONS　(L. S.)"

This instrument was likewise acknowledged; there were triplicate originals of this agreement, and each party had one of such triplicate originals.

The agreement of October 2, 1923, provided that the parties Brown and Lipe each " agrees to promptly transfer on the books of said Brown-Lipe Gear Company to said Parsons, ninety-five (95) shares of their common stock of said Brown-Lipe Gear Company." Subdivision (c) provided that if " said two lots of 95 shares of said stock is sold, or the title thereto in any way impaired, by said Parsons, then the entire balance due in payment on and for said stock shall forthwith become due and payable." Just what was meant by the words " transfer on the books of said Brown-Lipe Gear Company " does not clearly appear; that is, it does not clearly appear whether or not this meant that the certificates of stock evidencing the transfer of the shares should be issued to and delivered to Mr. Parsons. However, it has been assumed by all parties upon the trial that this expression meant the issuance and delivery of certificates of stock. In any event, whatever it meant, there was no transfer noted upon the books of the company by either Mr. Brown or Mr. Lipe of these shares, and no certificates of stock were issued to Mr. Parsons. There was the provision in subdivision (c) that indicated that by the agreement the title to the stock had passed to Mr. Parsons, for it says that if these shares are " sold, or the title thereto in any way impaired, by said Parsons, then the entire balance due in payment on and for said stock shall forthwith become due and payable." Possibly it was intended that the evidences of title, to wit, the certificates, were to be held by Brown and Lipe as security or as a protection. The matter is not free from doubt, and we have of course no testimony of the parties in respect thereto.

Apparently these provisions in the agreement had become a subject of consideration at least by Mr. Lipe, because there was prepared an instrument (Exhibit 3) which never became effective because not executed by Mr. Brown, which reads as follows:

" This agreement made April —, 1924, between Alexander T. Brown, Willard C. Lipe and Arthur E. Parsons, all of Syracuse, New York, supplementing their agreement of October 2, 1923,

regarding the sale of Brown-Lipe Gear Company stock to said Arthur E. Parsons,

" Witnesseth: That said Alexander T. Brown and Willard C. Lipe will each and do herewith deliver to the First Trust & Deposit Company, as trustee, certificates for ninety-five (95) shares of the common stock in said Brown-Lipe Gear Company indorsed in blank by them for transfer, to be transferred to said First Trust & Deposit Company, as trustee, on the books of said Brown-Lipe Gear Company and held by said trustee in trust for the purpose of assuring the performance of the agreement of October 2, 1923, a copy of which is hereto annexed and delivered to the trustee. Cash dividends declared on said stock shall be paid to the trustee and paid by it on account of the purchase of the stock to said Alexander T. Brown and Willard C. Lipe, their representatives or assigns, one-half to each, as provided in said agreement, and the stock shall be held by the trustee until it is fully paid for at the price of one thousand four hundred seventy-two dollars and fifty cents ($1,472.50) per share either by such dividends or by other payments made by said Arthur E. Parsons, his representatives or assigns. No interest shall be charged on the purchase price, and, when the purchase price of the stock, viz.: One thousand four hundred seventy-two dollars and fifty cents ($1,472.50) per share shall have been fully paid and not before, the trustee shall deliver the same to said Arthur E. Parsons, his representatives or assigns, and, until the time of such payment in full and delivery, the said trustee shall vote the said stock as directed in writing by the parties hereto or any two of them. Any stock dividends declared shall be held by the trustee during the term of the trust the same as the stock now delivered and cash dividends received thereon by the trustee disbursed as other dividends herein mentioned and if the present stock issue is called in by the Brown-Lipe Gear Company for the purpose of issuing other stock in place thereof, the trustee is authorized to surrender the stock held by it under this agreement and to accept in its place other stock issued by the said Brown-Lipe Gear Company in consideration of its surrender. In case of a sale of a majority of the common stock of the Brown-Lipe Gear Company, exclusive of that held by the trustee, at a price equal to not less than one thousand four hundred seventy-two dollars and fifty cents ($1,472.50) per share for the shares now delivered, the said trustee shall join in said sale upon the written request of the parties hereto or any two of them at the same price per share as paid for the said majority of other stock then sold and on the same terms, and the trustee, in that event, shall pay the purchase price of the stock then remaining unpaid

to Alexander T. Brown and Willard C. Lipe, their representatives or assigns, out of the avails of such sale and deliver the balance of the purchase price to Arthur E. Parsons. The trustee shall be liable only for its own misconduct or gross negligence and shall have the conclusive right to rely on the certificate of any two of the parties hereto as to any facts on which its duties arising hereunder depend.

" In witness whereof, the parties hereto have hereunto set their hands and seals the day and year first above written.

"_____  (L. S.)
" WILLARD C. LIPE  (L. S.)
" ARTHUR E. PARSONS  (L. S.) '

This instrument was acknowledged on the 16th of April, 1924, by Willard C. Lipe at the city of Battle Creek, Mich., and on the 6th day of May, 1924, by Arthur E. Parsons at the city of Battle Creek, Mich. It was not executed by Alexander T. Brown; nor was the trust accepted by the trustee. Attached to the agreement was a copy of Exhibits 1 and 2.

It is obvious that this instrument would have served to clarify any ambiguity contained in the agreement of October 2, 1923. It also evidenced the attitude of Mr. Lipe at the time and his purpose to carry out the terms of the agreement of October 2, 1923. For what reason it was not executed by Mr. Brown, or what, if anything, took place between Mr. Parsons and Mr. Brown with respect thereto, is not disclosed in the evidence. That Mr. Brown had a copy of the agreement submitted to him does appear; and that this agreement was never fully executed and never became effective is clear.

On April 16, 1924, Mr. Lipe signed and acknowledged a letter at Battle Creek, Mich., addressed to Brown-Lipe Gear Company, Syracuse, N. Y., attention of the secretary, reading as follows:

" GENTLEMEN: Please transfer at your earliest convenience to First Trust & Deposit Company, as trustee (95) ninety (sic) five, shares of my common stock in the Brown-Lipe Gear Company, these to be held by said trustee in accordance with a certain agreement between A. T. Brown, A. E. Parsons and myself dated April, 1924, and signed by me this 16th day of April, 1924.

" W. C. LIPE."

Promptly after the execution of the agreements of October 2 and October 3, 1923, Mr. Parsons undertook to make disposition of the capital stock owned by Messrs. Brown and Lipe in the Brown-Lipe Gear Company. It is unnecessary to detail here these efforts, for there is no question raised but that, so far as Mr. Parsons

had any duty in respect of efforts to sell this stock at not less than the price named was concerned, he had performed that duty. Excepting in reference to these efforts, the record is silent in respect of any evidence referable .to these agreements, apart from the instrument of April 16, 1924, signed by Mr. Parsons and Mr. Lipe, until June 9, 1924, on which day Mr. Brown, on his personal stationery, wrote and mailed a letter (Exhibit 34) to Mr. Parsons, which reads as follows:

" Mr. ARTHUR E. PARSONS,
          " Syracuse, New York.

" DEAR SIR: Referring to two papers signed by Willard C. Lipe, you and me, dated respectively October 2d, 1923, and October 3d, 1923, relating to stock in the Brown-Lipe Gear Company, you are hereby notified that each of said papers is, as to all its provisions and contents, hereby cancelled and repudiated by me, and I hereby refuse to sell or transfer to you any stock under any provision of said papers. *There have been no dividends nor is there any immediate prospect of dividends.*

" The said purported agreements contained no agreement by you to pay for any stock except by dividends and except as you should desire, and were executed wholly without any consideration or payment moving to us, at the time or since, and such purported agreements were, therefore, invalid, or if they should be construed to be valid, would require payment for the stock to be made within a reasonable time. Such reasonable time has now elapsed. The said purported agreements were not intended or understood to be a present transfer of stock and were, therefore, not stamped as required by law for actual transfers. The purported agreements have never been even partly performed, nor has any payment been made or any stock transferred under or pursuant to them. These purported agreements were obtained by you while in a confidential relation to Mr. Lipe and me as our manager of the company and as our attorney, neither of us comprehending the meaning of said purported agreements and both understanding that they were merely papers giving you the right to purchase and pay for the stock, and you using your legal knowledge to attempt to make the agreement otherwise.

" In order that you may have no cause for complaint, however, and in order that you may acquire this stock if you can pay for it, and that the time in which you may acquire it may be still more reasonable, I hereby (recognizing no obligation to do so, and in no manner recognizing said purported agreements) offer to sell you ninety-five (95) shares of the common stock of the Brown-Lipe Gear Company at any time within two (2) months from the

date hereof, on receiving therefor from you $1,472.50 per share, or $139,887.50 in cash. This offer shall be at an end and become ineffective at noon on August 9th, 1924.

"Very truly yours,

"ALEX. T. BROWN."

It would be interesting, were we permitted to know just what influences or reasons led Alexander T. Brown to write this letter; that he voluntarily and with full knowledge of the facts entered into the agreements of October 2 and October 3, 1923, is clear; there was no fraud perpetrated by Mr. Parsons upon either Mr. Lipe or Mr. Brown. October 3, 1923, Mr. Brown and Mr. Parsons together went to the law office of LeRoy B. Williams, and Mr. Williams dictated the agreement of October 3, 1923, after he had read, in the presence of these parties, the agreement of October 2, 1923 (Exhibit 1). There, that agreement was necessarily the subject of consideration; Mr. Williams was being consulted by both of these parties, and his law firm became the attorneys for Mr. Brown. The high standing, character and ability of Mr. Williams, generally recognized, render impossible the suggestion contained in this letter (Exhibit 34) that there had been any overreaching of any kind on the part of Mr. Parsons. This letter (Exhibit 34) is so legalistic in its tenor that it could not have been the product of the mind of Mr. Brown, and it shows on its face that it was written or dictated by an astute lawyer. In this letter, Mr. Brown practically charges Mr. Parsons with being guilty of fraud in procuring the execution by him and Mr. Lipe of Exhibits 1 and 2; and this in the face of a record which is replete with evidence of the absolute confidence which Mr. Brown and Mr. Lipe had in Mr. Parsons, and of the friendship existing between these three men. So far as their personal relations were concerned, these were in no wise disturbed after this notice of cancellation; Mr. Parsons continued in his position as general manager of the company as if nothing had happened. Apparently Mr. Lipe knew nothing about this letter of attempted repudiation; the whole matter, so far as the record discloses, remained a secret between Mr. Parsons and Mr. Brown and Mr. Brown's counsel and secretary; there was no interruption of their friendly relations. A little light is shed upon the matter by the testimony of LeRoy B. Williams, wherein he testified that when he asked Mr. Parsons how he was getting on with Mr. Brown, Mr. Parsons said: "We have decided to forget for the present." We may not go behind the veil. We do not know just what Mr. Brown told Mr. Parsons about this letter; but, whatever was told, and whatever their conversation was, there was no disturbance of the friendly relations between

Mr. Brown and Mr. Parsons; they had decided to "forget for the present." This letter of repudiation constitutes the sole act of Mr. Brown in that regard; he did nothing else except to sign it as dictated; he did not ask for the return of the papers or for their cancellation; he let it rest there. So strange is it all — this unusual act, this unjust act, this unkindly act — that one is led to wonder whether or not Mr. Brown was not driven to it by the exacting attitude of others. With this letter, Mr. Brown ceases to be a factor so far as these agreements, Exhibits 1 and 2, are concerned.

On September 4, 1924, Willard C. Lipe died, leaving a last will and testament wherein the City Bank Trust Company and his son, W. Charles Lipe, were named as executors. The will was duly admitted to probate, and upon the 8th of October, 1924, Stewart F. Hancock, attorney for the executors then and in this action, having learned of the Brown letter of June 9, 1924, had a conversation with Mr. Parsons. Mr. Hancock gives testimony as to this conversation, which covered many matters aside from the subject of controversy herein involved. He says that he stated to Mr. Parsons that he had learned of the Brown letter of June 9, 1924, and that it was necessary that he learn as to whether there was any claim by Parsons against the estate of Mr. Lipe growing out of the contracts of October 2 and 3, 1923. Mr. Hancock testifies that Mr. Parsons stated "that his relations with Mr. Lipe and with Mr. Brown had been close and friendly over a long period of years, and that he would not consider doing anything that was not entirely satisfactory and pleasing to them; that when he received the notice of cancellation from Mr. Brown he thought that ended the whole matter so far as he, Parsons, was concerned."

Mr. Hancock further testifies: "I said to Mr. Parsons that if it were my own personal matter I would be willing to accept his statement that he was making no claim on these contracts, without anything further, but, considering that I was the attorney acting for executors, I felt that the matter should be done in a business way, and therefore I would send him a formal notice of cancellation but I would make it as tame and mild as I could and still make the proceedings a matter of record. He said that he was a lawyer himself and appreciated that a lawyer had to handle things in a proper way."

On October 9, 1924, Mr. Hancock addressed a letter (Exhibit 98) to Mr. Parsons, which reads as follows:

"Mr. ARTHUR E PARSONS,
　　　　　　　　"Syracuse, N. Y.

"DEAR ARTHUR: I am enclosing herewith a formal cancellation of the contracts which you and I discussed on Wednesday.

"I have talked with Charles and he says that he is willing to sit down with you, Mr. Brown and myself, at any time, and to discuss in the broadest spirit the future policy of the company in the matters concerning which we talked. I desire to repeat what I said to you at the time of our talk and that is that you are to consider the enclosed document as a purely business document discharging what we consider to be the legal duty of the executors.

"Very truly yours,
"S. F. HANCOCK."

The inclosure (Exhibit 97) was signed by Messrs. Hancock, Dorr, Spriggs & Shove, by S. F. Hancock, "as Attorneys for City Bank Trust Company and Willard Charles Lipe, Executors of the Last Will and Testament of Willard C. Lipe," and reads as follows:

"*October 9th, 1924.*
"Mr. ARTHUR E. PARSONS,
"Syracuse, N. Y.

"DEAR MR. PARSONS: We find among Mr. Lipe's papers copies of paper writings purporting to be contracts or proposed contracts between Alexander T. Brown, Willard C. Lipe and yourself relating to stock of the Brown-Lipe Gear Company and purporting to be dated respectively October 2, 1923, October 3, 1923, and April 16, 1924.

"We have talked with Mr. Alexander T. Brown, Mr. Louis L. Waters and yourself concerning these paper writings and we have seen the formal rescission and repudiation of these purported contracts served upon you by Mr. Alexander T. Brown sometime in May, 1924.

"Confirming the conversation between you and ourselves on October 8, 1924, we do now, as attorneys for the City Bank Trust Company and Willard Charles Lipe as executors of the Willard C. Lipe Estate and by their authority, formally notify you that the aforesaid paper writings are each of them as to all their provisions and contents hereby cancelled and repudiated by the Willard C. Lipe Estate and that the Willard C. Lipe Estate hereby refuses to transfer to you or for your benefit any of the stock under any of the provisions of the said papers. *We take this action upon the same grounds stated by Mr. Alexander T. Brown in his formal cancellation served upon you during the month of May,* 1924, and also upon the further ground that it was understood between you, Mr. Brown and Mr. Lipe that Mr. Brown and Mr. Lipe were acting together, that nothing was to be binding upon one unless concurred in by the other and that when Mr. Brown cancelled the agreements of October 2, 1923, and October 3, 1923, and failed to sign the pro-

posed contract dated April 16, 1924, said paper writings and agreements were in effect cancelled and annulled not only as to Mr. Brown but as to Mr. Lipe as well.

" Very truly yours,"

The effect of this letter (Exhibit 97) was at least to accomplish the purpose which is disclosed in the conversation between Mr. Parsons and Mr. Hancock, to place the Lipe estate, in respect of the contracts of October 2 and October 3, 1923, in the same position as that of Mr. Brown. It is a singular thing, in respect of the cancellation notice of Mr. Brown and that prepared by Mr. Hancock for the Lipe estate, that neither of these parties demanded, or have ever demanded, the surrender up for cancellation of the agreements of October 2 and October 3, 1923. These agreements, if binding agreements, could only be cancelled by the concurrent act of the parties. That there was no cancellation of these contracts is evidenced by the fact that they are all still in existence and still in the possession of the proper parties. They were not surrendered, nor is there evidence of any demand for their surrender, or of any action taken by either Mr. Brown or Mr. Lipe to bring about their cancellation. If this was ever attempted, certainly Mr. Parsons refused to entertain the demand; and this fact is an impressive fact, in the light of which all the testimony bearing upon the subject of cancellation by estoppel, by acquiescence, by waiver, will have to be read. Mr. Hancock states certain inferences drawn from the conversation between himself and Mr. Parsons; but these are Mr. Hancock's inferences. What he did do was to send a notice of cancellation, the effect of which was to place the Lipe estate, in respect of the contracts of October 2 and 3, 1923, in the same position as was Alexander T. Brown at the time. Mr. Hancock of course knew that if the contracts were canceled they should have been canceled and delivered up. Mr. Parsons, a gentleman of high character, manifested a calm disposition under circumstances which must have been exasperating; and is it too much to gather that Mr. Hancock inferred too much when he said to Mr. Parsons " that if it were my own personal matter I would be willing to accept his statement that he was making no claim on these contracts: "

There is nothing in Mr. Parsons' statement, as given by Mr. Hancock, that he was making no claim under these contracts. The most that he said was that he thought when he received Brown's letter that that ended the matter. Mr. Parsons is dead. Mr. Hancock was then and now is attorney for one of the defendants in this action, and, without in any way impugning Mr. Hancock's testimony, he can scarcely escape the rules by which such testi-

mony is tested and the most severe scrutiny in respect of it; he was testifying as to events that happened some five years previously; he had made no minute of the conversation; what he did is more eloquent than what he said. It cannot be expected that unnecessary inferences favorable to the defendants' side would be drawn from testimony under such circumstances. Rather, what was done, as to which there is written record, will be the key to the significance of the conversation, because what was done must have been predicated upon what was said. And all Mr. Hancock did was to send a letter (Exhibit 97) the effect of which was to place the Lipe estate, in respect of its relations with Mr. Parsons, in the same position in which Alexander T. Brown stood, under cover of the " Dear Arthur " letter (Exhibit 98), which was an apology for being compelled to take that position. So far as this transaction is concerned, and on the main features of the case, there is no other inference that can be drawn than that Mr. Hancock felt that his duty as attorney for the executors of the Lipe estate was to place the Lipe estate in the same position in which Mr. Brown stood; and that he successfully did.

It will be noted that Mr. Hancock adopted, as the ground and reason for his letter of October 9, 1924, the grounds stated in the letter of Mr. Brown. Mr. Hancock knew, of course, when he wrote the letter to " Dear Arthur " that Mr. Parsons had not been guilty of the perpetration of any fraud upon either Mr. Lipe or Mr. Brown; and yet he adopted the reasons stated by Mr. Brown.

Among the other reasons, as stated in the letter of Mr. Brown and adopted by Mr. Hancock, is this: " There have been no dividends, nor is there any immediate prospect of dividends." This letter was dated June 9, 1924. The record of dividends since the agreements of October 2 and October 3, 1923, is as follows:

| | |
|---|---:|
| July 31, 1924, $ 50 per share..................... | $75,000 |
| July 27, 1925, $ 50 per share..................... | 75,000 |
| July 31, 1926, $150 per share..................... | 112,500 |
| Dec. 16, 1927, $200 per share..................... | 300,000 |
| Oct. 17, 1928, $200 per share..................... | 300,000 |
| Totals....$725 per share..................... | $1,087,500 |

This is evidence of the falsity of one of the major premises of the letter. These dividends were received and paid to Mr. Lipe and to Mr. Brown in proportion to their stock holdings, as shown by the books of the company. The dividend checks were signed by Mr. Parsons as treasurer, and the letters of transmittal by him as general

manager; Mr. Brown and Mr. Lipe each received the dividends upon the 95 shares which each had contracted to sell to Mr. Parsons. The amount received on this account was 190 times $725, or $137,750., In other words, by October 17, 1928, the dividends applied, if the contract is a valid and subsisting one, made a payment on the amount of the purchase price of $1,472.50 per share of $725 per share on the 190 shares, or $137,750, leaving unpaid a balance of $142,025, or to each Mr. Brown and Mr. Lipe $71,012.50.

On or about December 1, 1928, the plaintiff served upon the executors of the last will and testament of Willard C. Lipe a notice (Exhibit 122) setting forth fully the claims of the plaintiff under the agreements of October 2 and October 3, 1923, demanding performance of the agreements, and advising that, upon failure to advise of intention to comply with the demands, it was the plaintiff's intention to bring actions. A similar notice (Exhibit 123) was served upon Alexander T. Brown.

The record is barren of any other action or conduct on the part of Mr. Brown, on the part of Mr. Lipe, or on the part of Mr. Parsons, from October 2, 1923, down to the date of the option of October, 1928 (Exhibit 127), excepting that Mr. Parsons continued in the management of the business, as treasurer of the company, and as to the payment of dividends.

On October 5, 1928, Alexander T. Brown, George Sponable, Arthur E. Parsons, E. Hobart Hungerford, W. Charles Lipe, W. C. Lipe Estate by W. Charles Lipe, coexecutor, Charles S. Brown and H. W. Chapin, constituting all of the stockholders of the Brown-Lipe Gear Company, gave an option (Exhibit 127) which reads as follows:

" Mr. VIRGIL H. CLYMER,
        . "535 Onondaga Bank Building,
                "Syracuse, New York.

" DEAR SIR: In consideration of five dollars ($5.00), payment of which is hereby acknowledged, and other valuable considerations, the undersigned, and each of us, hereby give and grant unto you sixty (60) days from the date hereof, an option to purchase all the issued and outstanding stock, *whether standing in our name or not,* of Brown-Lipe Gear Company, a corporation having its principal place of business in the City of Syracuse, New York, for a total sum of three million five hundred thousand dollars ($3,500,000.00) in cash."

While it is true that this option was not taken up, it is important to note that, although these parties knew exactly where all the stock was and how it stood upon the books of the company, and that they constituted the owners of all the stock for which certificates

had been issued, and knew all the names of stockholders standing on the books of the company, still they stated in this option, signed by all of them, including Alexander T. Brown, Arthur E. Parsons and the W. C. Lipe estate, some four years after the alleged repudiation, these words that they were giving an option to purchase all of the issued and outstanding stock, "*whether standing in our name or not.*" This phrase could have no possible meaning unless it was intended to refer to the fact that there was stock in a different ownership than that shown by the record title; and that stock was and could have been no other than Mr. Parsons' 190 shares of stock. So that, at this time at least, when in respect of third parties it was essential to speak, these parties, the three of them, or their representatives, did speak so as to bind themselves to deliver all of the stock of the company, "*whether standing in our name or not.*"

After this option was given, on the 31st of October, 1928, Mr. Parsons died, and the plaintiff was named in the probated will of Mr. Parsons as executrix thereof.

In December, 1928, the option of October 5, 1928, having expired, Mr. Brown and the Lipe estate requested the plaintiff to join in a new option which provided for the sale of all the capital stock of the Brown-Lipe Gear Company for $3,400,000, or at the rate of $2,266.66 per share. This option she refused to sign excepting upon the parties entering into two separate contracts, dated December 12, 1928, one with Alexander T. Brown and one with the executors of the Lipe estate and W. Charles Lipe individually. These contracts, which are identical in form, excepting as to the names, are marked Exhibit 28 and Exhibit 29 respectively.

Exhibit 28 is that executed by Mrs. Parsons as executrix and Alexander T. Brown; it is acknowledged by both, and consented to by the wife of Mr. Brown and by his two sons. It recites that Mrs. Parsons claims to be the owner of or to be entitled to 95 shares of the common stock of the Brown-Lipe Gear Company, " which are included in the common stock of such company still standing on the books of the company in the name of Alexander T. Brown, such claim being based on an instrument dated October 2, 1923, as supplemented by an instrument dated October 3, 1923, executed by said Brown and by Willard C. Lipe and said Arthur E. Parsons; and

" Whereas, said Arthur E. Parsons joined said Brown and the other stockholders of the Gear Company in the execution of an option, dated October 5, 1928, to Virgil E. Clymer to purchase all of the stock of said company for three million five hundred

thousand dollars ($3,500,000.00), which option expired on December 6, 1928, *and was not exercised as to any of such stock owned by said Arthur E. Parsons or his estate;* "

And further recites that " Whereas, said Parsons claims that said Arthur E. Parsons at the time he executed said option of October 5, 1928, and at the time of his death on October 31, 1928, was the owner of or entitled to ninety-five (95) shares of the common stock of said Gear Company, which then and now stand on the books of said company in the name of said Brown, and also to ninety-five (95) shares of such stock, which then and now stand on said books in the name of the executors of Willard C. Lipe and/or W. Charles Lipe; "

And further recites that " Whereas, in an instrument dated November 26, 1928, (hereinafter sometimes called ' new option '), heretofore signed by all the stockholders of said company, excepting the estate of Arthur E. Parsons, it is provided that William Schall & Co., of 160 Broadway, New York City, has the right and option to purchase the stock of said Gear Company for three million four hundred thousand dollars ($3,400,000.00) by complying with the terms thereof, and said Parsons has been requested to sign such instrument, individually and as such executrix, so as to give said William Schall & Co. the right to purchase thereunder all stock of said Gear Company in or to which the estate of Arthur E. Parsons, or she as executrix thereof or individually, has any right, title or interest; "

And then recites that (unimportant recitals omitted) * * *.

And further recites that " Whereas, said Brown desires that said Parsons, individually and as such executrix, join with him and the other stockholders of said Gear Company in executing said new option, and to induce her to do so is willing that the purchase price for ninety-five (95) shares of the common stock of said Gear Company now standing in his name on the books of said company be paid to First Trust & Deposit Company, of Syracuse, New York, to be held by it in trust for the purposes and subject to the terms and conditions hereinafter set forth; "

And that whereas Mrs. Parsons is willing to do the same thing, the agreement is as follows:

" 1. That in case the option dated November 26, 1928, to William Schall & Co. for the purchase of the stock of the Gear Company is exercised, then the moneys and funds payable thereunder for ninety-five (95) shares of the common stock of said Gear Company now standing on its books in the name of said Alexander T. Brown, which it is agreed will amount to two hundred fifteen thousand three hundred thirty-two dollars and seventy cents ($215,332.70), shall

be paid to and deposited with First Trust & Deposit Company, of Syracuse, New York (hereinafter called 'Trust Company'), to be held by it as trustee thereof for the purposes and upon and subject to all of the conditions and agreements herein stated.

"2. As since October 2, 1923, the dividends paid to and received by said Brown on said ninety-five (95) shares of stock have amounted to the total sum of sixty-eight thousand eight hundred seventy-five dollars ($68,875.00) ($725.00 per share), leaving a balance to be paid thereon under the terms of said instrument of October 2, 1923, of seventy-one thousand twelve dollars and fifty cents ($71,012.50) ($747.50 per share), it is agreed that said Trust Company is authorized to immediately pay to said Brown from the said moneys and funds deposited with it hereunder the sum of seventy-one thousand twelve dollars and fifty cents ($71,012.50). The balance of said moneys and funds, which it is agreed will amount to one hundred forty-four thousand three hundred twenty dollars and twenty cents ($144,320.20), is to be held by said Trust Company in trust as a separate and distinct fund or account, subject to the further terms and conditions hereof. Said balance is herein sometimes referred to as the 'trust fund.'

"3. * * *.

"4. If in any suit, action or proceeding brought by either party hereto the final judgment is that the estate of Arthur E. Parsons and/or Julia F. Parsons, as executrix thereof or individually, is now the owner of or entitled to ninety-five (95) shares of the common stock of said Gear Company now standing on its books in the name of said Brown, or the proceeds from the sale thereof, then said Parsons shall be entitled to receive, and have paid to her by the Trust Company, the whole of said trust fund and all interest thereon and income therefrom.

"5. * * *.

"6. * * *.

"7. * * * herein means a court decree, order or judgment, at law or in equity, from which no appeal is pending and when the time to appeal therefrom or to apply for leave to so appeal has expired.

"8. * * *.

"9. * * *.

"10. * * *.

"11. * * *.

"12. It is the intent of the parties hereto that the execution hereof shall be without prejudice to any rights or claims of either of said parties in respect to said ninety-five (95) shares of stock and that neither party by such execution shall be deemed to have waived

or released any of said rights or claims, except that the rights of each of the parties hereto in, to and in respect to said shares shall be transferred to said trust fund as above provided, if said new option is exercised.

" 13. Said Brown acknowledges that said Parsons has heretofore notified him of her claims to said ninety-five (95) shares of stock and has demanded of him the delivery to her of the certificates therefor; but that he has refused and still refuses to comply with such demand.

" 14. It is understood and acknowledged by said Brown that said Parsons has executed said new option, simultaneously with the execution by her of this instrument, in consideration of the agreements herein by Brown and similar agreements with respect to the ninety-five (95) shares of stock of said Gear Company standing on its books in the name of the executors of the estate of Willard C. Lipe or his legatees contained in an instrument of even date herewith.

" 15. * * *.

" 16. * * *.

" This instrument shall bind and inure to the benefit of the executors, administrators and assigns of said Brown and of said Parsons, and of any other executor or administrator of the estate of Arthur E. Parsons.

" In Witness Whereof, said parties have hereunto set their hands and seals on the day and year first above written.

" Executed in triplicate.

" ALEXANDER T. X BROWN   (L. S.)
his
mark

" Witness to signature of Alexander T. Brown
   " E. W. LAWTON
      " JULIA F. PARSONS          (L. S.)
       " Executrix of Estate of Arthur E. Parsons

" Witness to signature of Julia F. Parsons
   " MATTHEW R. QUINN
      " JULIA F. PARSONS          (L. S.)"

(Provisions 3, 5, 6, 7, 8, 9, 10, 11, 15 and part of 16 omitted as unimportant here.)

This instrument was executed in triplicate, duly acknowledged by the parties thereto, and a copy retained by each party.

There had been no surrender by Mr. Parsons of the contract of October 2, 1923. It was found, with the other papers relating to it, in his safety deposit box after his death; there was no surrender or cancellation of the other triplicate originals; there was no agreement, in writing or otherwise, between the parties signatory to the

contract in anywise modifying or affecting it, excepting the agreement dated October 3, 1923.

On the 3d of January, 1929, the plaintiff served a notice (Exhibit 30) upon the executors of the Lipe estate and upon W. Charles Lipe demanding their consent to the payment of the trust fund held by the City Bank Trust Company to the plaintiff, and notifying defendants of intention to bring an action. On the 23d of January, 1929, a like notice (Exhibit 31) was served upon Alexander T. Brown. The option above referred to had at that time been carried out; the stock of the Brown-Lipe Gear Company had been delivered over to the purchasers and the money received on account of the capital stock in dispute deposited with the several trustees, as set forth in the agreements, Exhibits 28 and 29. On the 1st day of February, 1929, Mr. Brown died, and thereupon, there having been failure to meet the demand, the actions were brought.

There have now been detailed the circumstances and the status of the parties at the time of the execution of the agreements bearing date October 2 and October 3, 1923. What was actually done by the parties in reference to the contract? There were efforts made at cancellation or repudiation by Mr. Brown and by the Lipe estate. Assuming that we have here a valid contract, no one a party to it, without consent by the others, by mere notice could cancel it. The letter written by Mr. Brown and the letter written by Mr. Hancock on behalf of the W. C. Lipe estate were futile efforts to cancel it. On account of the large values which are here involved, it is evident on its face that these contracts were not mere idle ceremonies; that they were not intended to be of a character such that by the whim of any party they could be cast aside; they were seriously entered into; they were executed under seal; they were duly acknowledged. Every document in evidence bearing upon or relating to these contracts was executed under seal and duly acknowledged.

This brings us to the consideration of the contracts themselves.

The contract of October 2, 1923 (Exhibit 1), was a valid contract, binding upon the parties. Objection is made that there was no consideration. The answer is that, aside entirely from mutual promises, it recites a consideration: " one dollar and other good and valuable considerations." Furthermore, the contract itself is under seal, which, at common law, was conclusive evidence of a sufficient consideration, and this conclusive character could not be modified by parol testimony. (*Harris* v. *Shorall*, 230 N. Y. 343; *Hocking Valley R. Co.* v. *Barbour*, 192 App. Div. 654; *Alexander* v. *Equitable Life Assur. Society*, 233 N. Y. 300; *Leonard* v. *Schnaier*, 119 Misc. 200.)

The common-law rule has been modified by section 342 of the Civil Practice Act, which reads: "A seal upon an executory instrument is only presumptive evidence of a sufficient consideration, which may be rebutted as if the instrument was not sealed." Furthermore, if the contract was executed, then the section has no application. (*Hull* v. *Hull*, 172 App. Div. 287.)

The rule of the common law that a seal imports a consideration still remains, although it is modified to the extent that it is only presumptive evidence of a consideration. Apart from the question of a seal as evidence of a consideration, it may, under certain circumstances, be explained by oral testimony, but scarcely so where the consideration is an operative part of the contractual act, " as when in the same writing the parties set out their mutual promises as considerations for each other; here the word ' consideration ' signifies a term of the contract, and hence the writing alone can be examined. (5 Wigm. Ev. [2d ed.] § 2433. Cited in *Hocking Valley R. Co.*, v. *Barbour*, 192 App. Div. 654.)

In the present instance there was a recited consideration, the receipt of which was acknowledged by both parties, with the instrument under seal, and in addition thereto there were mutual promises; and yet the defense in the case has failed to offer any evidence whatsoever to rebut the presumption arising from the fact that the instrument was sealed, or to explain the other expressions of consideration. Not lightly are the express, clear and unambiguous statements in written instruments of contract, in the absence of fraud, to be affected by parol testimony; but here, on the subject of consideration, there is no testimony even offered by the defendants. What was meant by " other good and valuable considerations " we do not know. Was there any thought that, in view of the successful growth of the enterprise under the management of Mr. Parsons, Mr. Brown and Mr. Lipe (one elderly and one seriously afflicted if not retired from active management) sought to tie him to a continuity of service, or felt that his services had not been adequately requited; or were other industrial units seeking to employ him? Were such kindred considerations what they meant by " other good and valuable considerations? " On the subject of consideration in this agreement, Parsons agreed to use his best endeavors to bring about the early purchase and sale of their preferred and common stock of the Brown-Lipe Gear Company. They wanted to sell and agreed, upon completion of the sale, to pay Parsons five per cent commission upon the purchase price; but he was to have nothing for his endeavors in that respect, other than expressed later in the contract, in case he did not bring about a sale. In reference to the sale of the ninety-five shares by each,

Brown and Lipe, to Parsons, there is a mutual agreement, under and pursuant to the terms of which Parsons " *agrees to, and hereby does, purchase* from each said Brown and Lipe, and said Brown and Lipe *each agrees to, and hereby does, sell and assign and agrees to promptly transfer on the books of said Brown-Lipe Gear Company to said Parsons,* ninety-five (95) shares of their common stock of said Brown-Lipe Gear Company (ninety-five from Brown and ninety-five from Lipe) at the price of $1,472.50 ($1,550.00 less 5%) per share." Here was complete mutuality, one to purchase and the other two to sell, in addition to the expressed considerations and the unrebutted presumption of consideration imported by the seal. Such were the promises; the method of payment by Parsons was another matter. Instead of being lacking in consideration, the instrument is pregnant with it.

The instrument of October 3, 1923 (Exhibit 2), likewise under seal and acknowledged, constituted merely a modification of the original agreement (Exhibit 1), to which it was supplementary. It provided: " That at any time after January 1, 1924, the said Alexander T. Brown and Willard C. Lipe, or either of them, by written notice to said Arthur E. Parsons, may cancel their said agreement of October 2, 1923, and said agreement shall on the service of such written notice terminate and be of no further effect *excepting the third provision thereof relating to the sale of ninety-five (95) shares of stock by each of them to said Arthur E. Parsons which shall remain in full force and effect.*" In other words, the effect of this instrument was no different than if at the end of the second paragraph thereof there had been added another paragraph giving Messrs. Brown and Lipe the option, after January 1, 1924, to terminate the provisions 1 and 2 in the agreement of October 2, 1923. That was its purpose, and that was its effect. The agreement of October 3, 1923, is a reaffirmance of the agreement of October 2, 1923, as to the sale to Parsons. As so modified, the agreement of October 2, 1923, remains and continues, in its entirety, as a valid contract, based not only upon a consideration, expressed and implied, but buttressed by mutual promises.

But it is urged that the contract was void for lack of mutuality. We have already shown that there is no force to this suggestion.

Again, it is urged that in view of the fact that the contract provides that the shares of stock are to be paid for through dividends declared, there was no consideration because the payments were being made out of moneys to which Mr. Brown and Mr. Lipe were entitled — although the agreement further provides that Parsons should be free to make such additional payments as he might from time to time desire to make. This suggestion entirely overlooks

the fact that the agreement was based upon a consideration, *aliunde* this provision as to the method of payment recited in the instrument; and the instrument was under seal. These two facts cannot be overlooked, for the consideration expressed is related to the whole and every part of the contract. Furthermore, Mr. Parsons agreed to purchase the stock and to pay the price named therefor.

While the attention of the court has not been called to any specific case wherein a court of this State has passed upon the effect of a contract for the payment of the purchase price of capital stock through dividends, yet the practice is known not to be uncommon and has been sustained by courts outside of the State of New York. (*Stewart* v. *Herron*, 77 Ohio St. 130; 82 N. E. 956; *Dean* v. *Nelson*, 77 U. S. [10 Wall.] 158; *Stonebraker* v. *Littleton*, 119 Md. 173; 86 A. 150; *Peavey* v. *Wells*, 136 Minn. 180; 161 N. W. 508; *Johnston* v. *Stearns & Co.*, 160 Mich. 247; 125 N. W. 29; *Hutchinson* v. *Sperry*, 261 Fed. 133.) In one New York case the validity of such an agreement was not questioned (*Doheny* v. *Lacy*, 168 N. Y. 213).

But it is said that there was no certainty that dividends would be declared, and, therefore, the payments being dependent upon earnings distributed, the time might never arrive when the payments would be made. The agreement to purchase and the agreement to sell at a price per share named was a complete statement of a sale and purchase, the purchase price to be paid for out of dividends, but not necessarily out of dividends alone, but, at the option of Mr. Parsons, he could make payments upon the purchase price as he might desire, from time to time. If a gift had been intended, such would not have been the form of the contract. We are construing a contract as to its essence. This was a serious instrument, solemnly executed and acknowledged by these parties in good faith, and an ordinary rule of interpretation would dictate that where construction may be necessary it be so construed as to carry out rather than to defeat the will of the parties. It is true, according to the wording of the agreement, the time of payment is indefinite; that indefiniteness arises because of the uncertainty, first, as to whether dividends would be paid and the time when the dividends would be sufficient to pay the amount of the purchase price. There is nothing in the contract which says that unless there are dividends paid there is no obligation on the part of Mr. Parsons to pay the purchase price of the stock. So far as obligation is concerned, there being no release of Mr. Parsons from his duty to pay for this stock at the rate of $1,472.50 per share, he was in no other or different position than he would have been if the contract had stopped and said nothing about the time or terms of payment,

excepting that he was to pay $1,472.50 per share. It could not be said that such a contract was invalid because of indefiniteness as to the time of payment, but the contract would be construed to mean that the payment should be made within a reasonable time; and what was a reasonable time would have to be determined as a question of fact, in the light of the circumstances surrounding the instrument; the effect of the provision in respect to the manner of the payment would be its influence upon the determination as to what was a reasonable time, according to the contemplation of the parties, within which the payment should be made; this reasonable time would not be fixed by a statement of one of the parties to the contract, but it would be such time as the parties might agree upon or as the court might determine. (*Stewart* v. *Herron, supra.*) So, under this contract, it was possible for Mr. Lipe and Mr. Brown to make a demand for the payment within a reasonable time for this stock, and the obligation would then be upon Mr. Parsons to make payment within such time. No such demand was made by the defendants or their predecessors. Mr. Brown's offer to let Mr. Parsons have his stock for the price named if paid in two months was not an effort to fix a reasonable time under the contract; he had repudiated the contract; it was a new offer, which was not accepted by Mr. Parsons.

The foregoing rather disposes of the suggestions arising out of an attempt to distinguish between conditions existing and rules applicable in cases of executed as distinguished from executory contracts.

While in New York we have, in statute and judicial decision, continued the use of the words " executory contract " as distinguished from " executed contract," the words are really rather meaningless. When a contract has been *executed*, there remains no contract. There may be consequences arising *aliunde* of the contract itself, growing out of fraud and misrepresentation; there may be covenants running with the land, or personal covenants remaining; but these are provisions of the contract, even where it has been executed by the payment of consideration and the delivery of the deed or other property. While there remains any unexecuted part of a contract, there remains the contract. A distinction which remains is that an executed contract, which is no longer a contract, remains executed after being executed, even though there was no consideration. There is also the distinction as to legal and equitable principles or doctrines applicable as remedies or defenses; but such was always the case, irrespective of nomenclature. It is significant that in the Restatement of the Law of Contracts by the American Law Institute there is no mention of such a thing as an " executed "

or " executory " contract. The matter is well stated in section 14 of Williston on Contracts: " If a transaction is fully executed on both sides, it is not properly described as a contract. The term ' executed contract ' has, however, been sometimes used to describe executed consensual agreements, like sales completely carried out on both sides. The same term has also been used to describe unilateral contracts which are executed on one side only, as sales where the price has not yet been paid. Since the phrase if understood in the former meaning contains an improper use of the word contract, and in any event is ambiguous, its use is better avoided. The same criticism, so far as ambiguity is concerned, applies to the phrase ' executory contracts.' All contracts to a greater or less extent are executory. When they cease to be so, they cease to be contracts." So here, as in all cases of interpretation of contracts, we should not be misled by the artificialities of classification. The use of the words " executed," " executory," " bilateral," " unilateral," may serve to define mental categories, but in the end we have a contract to interpret. Artificial categories serve sometimes to clarify, but where they become merged in a particular case they serve only to confuse thought. So this contract, in its very essence, has in it provisions performed, but, generally, it still is a contract, under which there are duties and obligations to be performed. Whether in any respect it be unilateral and in any other respect bilateral, or whether the question of mutuality of obligation is raised, it still remains a contract, based upon considerations unassailed, to be studied and interpreted in its entirety rather than by endeavoring to pick out a single paragraph by itself and say that it is lacking in elements essential to create a binding contract.

Mr. Parsons performed his part of the contract in so far as he was called upon to endeavor to sell the stock. That part of the contract, if unlimited, would of necessity have terminated at his death. Mr. Brown and Mr. Lipe reserved the right, after January 1, 1924, to terminate that part of the agreement. Whatever else may be said of Mr. Brown's letter of June 9, 1924, in which he repudiated the whole contract, it was effectual to terminate the option or the right which was given to Mr. Parsons to sell the Brown-Lipe Gear Company stock at a price. This position of Mr. Brown, having been adopted a short time later by the W. C. Lipe estate, was effective as to it to the same extent; in other words, after these notices were sent to Mr. Parsons, even if he had made a sale afterwards, he could not have had his reward in commissions under the contract. So that, upon the termination of this part of the contract, all that happened was that Mr. Parsons had lost the time and the money expended by him for the purpose of carrying out his agree-

ment to endeavor to sell the stock of Brown and Lipe at $1,550 per share, and he had lost his reward of five per cent commission on such purchase price; this was all a part of the agreement. But there remained the other parts of the agreement yet to be performed by Mr. Brown and Mr. Lipe and yet to be performed by Mr. Parsons.

Looked at from the language of the contract itself, and following in the line of the decisions of the courts of our State and of most of the States passing upon the subject, there has been a clear distinction made between capital stock of a corporation and the certificates of stock, and that distinction is this: that the capital stock is the substance, the thing of real value, the money or property of the corporation put in to make up its capital, while a certificate of stock is but the evidence of an ownership of a part or share of the capital stock. It was not necessary to issue certificates of stock in order that a person might be a stockholder in a corporation. True, the common parlance in reference to certificates of stock, the easy transfer of these certificates, the business practice in reference to them upon the stock exchanges of the country, their availability as collateral, some determinations that they are subject to larceny or conversion, have led to the thought that stock certificates were the capital stock instead of evidence of an ownership of a proportionate interest in corporate property. Nevertheless, the fact still remains that certificates of stock are but the evidence of the ownership of shares of the capital stock of a corporation. These certificates are assignable and carry with them to the assignee the evidence of title; and, in some respects, they might be denominated as the muniment of title. (14 C. J. pp. 387, 390, 478, 479 and 480; *Burr* v. *Wilcox*, 22 N. Y. 551; *Burrall* v. *Bushwick R. R. Co.*, 75 id. 211; *Wheeler* v. *Millar*, 90 id. 353; *Jermain* v. *Lake Shore & Mich. So. R. Co.*, 91 id. 483; *Francis* v. *New York & Brooklyn El. R. R. Co.*, 108 id. 93; *Matter of Bronson*, 150 id. 1; *U. S. Radiator Co.* v. *State of New York*, 208 id. 144; *Holmes* v. *Camp*, 219 id. 359; *Lockwood* v. *U. S. Steel Corp.*, 209 id. 375; *Nowy Swiat Pub. Co.* v. *Misiewicz*, 246 id. 58; *Pierpoint* v. *Hoyt*, 260 id. 58.) There would be no difficulty here in determining that, under the terms of the agreement, there was an absolute purchase and sale of 190 shares of the common capital stock of the Brown-Lipe Gear Company and that the title, equitable if not legal, to such shares passed to Mr. Parsons, were it not for certain provisions of the Stock Corporation Law, the Personal Property Law and the Tax Law. (*Grymes* v. *Hone*, 49 N. Y. 17; *Matter of Borst*, 129 Misc. 424; affd., 248 N. Y. 556; *Matter of Cohn*, 187 App. Div. 392; *Beardsley* v. *Beardsley*, 138 U. S. 262.)

Section 65 of the Stock Corporation Law provided: " The stock of every stock corporation shall be *represented by certificates* * * *; and shall be transferable in the manner prescribed in this chapter and·in the by-laws. * * *. Every such certificate shall plainly state the number, kind and class of shares which it represents; the authorized capital stock of the corporation and the par value of its shares." (Laws of 1923, chap. 787.)

Section 162 of the Personal Property Law provides:

" Title to a certificate and *to the shares* represented thereby can be transferred only,

" (a) ·By delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby, or

" (b) By delivery of the certificate and a separate document containing a written assignment of the certificate or a power of attorney to sell, assign or transfer the same or the shares represented thereby, signed by the person appearing by the certificate to be the owner of the shares represented thereby."

Section 171 of the Personal Property Law reads: "An attempted transfer of title to a certificate or to the shares represented thereby without delivery of the certificate *shall have the effect of a promise to transfer and·the obligation, if any, imposed by such promise shall be determined by the law governing the formation and performance of contracts.*"

Section 278 of the Tax Law provides: " No transfer of certificates taxable under this article made after June first, nineteen hundred and five, on which a tax is imposed by this article, and which tax is not paid at the time of such transfer shall be made the basis of any action or legal proceedings, nor shall proof thereof be offered or received in evidence in any court in this state."

Section 270 of the Tax Law provides: " It shall be the duty of the person or persons making or effectuating the sale or transfer to procure, affix and cancel the stamps and pay the tax provided by this article."

·Section 278 of the Tax Law refers to the transfer of stock certificates. Its language is the " transfer of certificates taxable under this article." In the instant case there were no certificates transferred, but there was a sale of stock, with an agreement promptly to transfer certificates.

The provisions of sections 270–278 of the Tax Law have no application to a situation such as here exists, and that the prohibition as to the admission in evidence of transfers of certificates taxable has ·no application is clear. It was not a case where there was a memorandum of sale accompanying the certificate itself,

assigned in blank; it was simply a contract whereby one party agreed to sell and another party agreed to purchase, without a delivery of the certificate or a transfer thereof. (*Waddle* v. *Cabana,* 220 N. Y. 18; *Bean* v. *Flint,* 204 id. 153; *Luitwieler* v. *Luitwieler P. E. Co.,* 231 id. 494; *Gaffney* v. *People's Trust Co.,* 191 App. Div. 697; *Phelps-Stokes Estates* v. *Nixon,* 222 N. Y. 93.)

In the case of *Waddle* v. *Cabana* (*supra*) there was an agreement for the purchase and sale of certain shares of stock in a corporation, at an agreed price. There were no stamps attached to the agreement, and there was no delivery of the certificate of stock. The court said: " The contract is not unenforceable for failure to comply with the Tax Law (Sections 270–278) relative to taxable transfers of stock. When the stock certificates are actually transferred the seller must stamp them to make an effective delivery in fulfillment of his contract * * * and the statute will then be fully satisfied."

While I think these cases are sufficient to settle the question that section 278 of the Tax Law has no application to a situation such as we have here, yet, assuming that it does, the plaintiff's testator had no duty to pay the tax and to affix the stamps; that duty was imposed upon the defendants' testators (§ 270), and it certainly would be an anomaly in law and in equity that the failure to perform a duty imposed by statute, which failure made the parties derelict guilty of a misdemeanor (§ 273) and in addition subjected them to civil penalty (§ 277), could be set up and used as a defense to an action to recover either for a breach of a contract or for specific performance thereof. (*Ambrosius* v. *Ambrosius,* 167 App. Div. 244; *Reinhard* v. *Roby Co.,* 110 Misc. 152; *Hall* v. *Davis,* 95 id. 315; *Matter of Borst,* 129 id. 424; affd., 248 N. Y. 556.)

It remains to be considered what effect, if any, sections 162 and 171 of the Personal Property Law (*supra*) have upon the situation which we find here, where there was no delivery of the certificates. There was a sale and purchase of shares and a provision for prompt transfer upon the books of the company. The agreement must be construed as a purchase and sale of the stock, with a provision for a delivery of the certificates of the shares. This was no " attempted " transfer; it was a definite agreement for purchase and sale. As a pure matter of law, the transaction seems to come within the limitations of the said sections, and would be of particular concern if the rights of third parties were involved; but no such rights are here involved. The contract of sale provides that it shall " bind the heirs, legal representatives and assigns of the parties hereto." Section 171 (*supra*) has never been considered in any case. The

purpose of the section is to protect (a) the corporation in its dealings with its stockholders (for instance, as to dividends), and (b) third parties who have taken delivery of certificates of stock; it materially tends towards the negotiability of stock certificates to the extent that it gives an assurance of title, a condition essential according to the practices of modern stock exchanges; it does not alter or change the nature of the contract or the interpretation of it as between the parties to the contract. This is the meaning of the provision of the section where it says that a transfer of title to the shares shall have the effect of a promise to transfer *" and the obligation, if any, imposed by such promise shall be determined by the law governing the formation and performance of contracts. '* While it does not affect the nature or substance of the agreement as between the parties, it does affect the form of the remedy.

These sections certainly operate upon the corporation, determining the conditions under which transfers of shares or of certificates may be recognized by them. Corporations are creatures of the State, and their powers and methods of operation may be determined and regulated by the State; but it was not the intent of the Legislature to go so far as to impair the right of free contract between individuals in reference to their property. However, in order to prevent fraud, in order to protect the rights of innocent third parties, these provisions of the Personal Property Law affecting the transfers of corporate stock were necessary. Here no questions of fraud, no questions of the rights of third parties are involved.

One of the cardinal principles of equity jurisprudence is that equity deems that to have been done which ought to have been done. As has been said: " The true meaning of the maxim is that equity will treat the subject-matter, as to collateral consequences and incidents, in the same manner as if the final acts contemplated by the parties had been executed exactly as they ought to have been; not as the parties might have executed them. But equity will not thus consider things in favor of all persons; but only in favor of such as have a right to pray that the acts might be done. * * * All agreements are considered as performed which are made for a valuable consideration, in favor of persons entitled to insist on their performance. They are to be considered as done at the time when, according to the tenor thereof, they ought to have been performed. They are also deemed to have the same consequences attached to them, so that one party or his privies shall not derive benefit by his laches or neglect; and the other party, for whose profit the contract was designed, or his

privies, shall not suffer thereby." (10 R. C. L. p. 384.) So I must adhere in this case to the proposition that, as between the parties to the contract, this contract effected a transfer of the equitable if not legal title to these 190 shares of stock to Arthur E. Parsons; as between the parties the contract was executed, and the question of consideration in this aspect became immaterial. So much for the nature of the agreement.

There did remain something to be done; Messrs. Brown and Lipe agreed promptly to do it. They did not then or promptly afterwards deliver the certificates of stock. Evidently the r certificates had to be split up in order to carry out the terms of the agreement; and this they agreed promptly to do; but they failed in their duty in this respect. Can it be possible that by reason of their failure in the performance of an express provision of the contract they may use such failure to defeat the contract itself? Equity, which is good conscience, says no. All I am saying in this connection is not in contravention of the law, for equity follows the law; but I am saying that the sections of the Personal Property Law above quoted were not designed or intended to defeat substantial rights or to limit the powers of a court of equity in the interpretation of the meaning of a contract.

As I view the purpose of this action, it is that the defendants be directed to now clothe the plaintiff with the evidence or symbol of her rights, as required by the contract. The fact that under the agreements of December 12, 1928 (Exhibits 28 and 29), the proceeds of the sale of the stock stand on deposit, pending the determination of this action, in no wise alters the nature of the action itself. The proceeds take the place of the certificates. Equity looks to the substance rather than to the form.

The questions involved herein in reference to the nature of the transactions of October 2 and October 3, 1923, are such that, even in the presence of the clear breach of the contract on the part of defendants in both actions, or their predecessors in interest, the plaintiff's remedy at law, as of the time of the breach, was inadequate; and the fact that that inadequacy is no longer present, by reason of the sale of the stock, does not alter that situation.

This was not a stock that had a market value; all of the stock was held by three people. Under such circumstances, equity does not turn away a suitor on the ground that there is adequate remedy at law. (*Butler* v. *Wright*, 186 N. Y. 259; *Johnson* v. *Brooks*, 93 id. 337; *Matter of Argus Co.*, 138 id. 557; *Williams* v. *Montgomery*, 148 id. 519; *Bomeisler* v. *Forster*, 154 id. 229; *Lighthouse* v. *Third Nat. Bank*, 162 id. 336; *Deitz* v. *Stephenson*, 51 Ore. 596; 95 P. 803; note Ann. Cas. 1915D, p. 790; *Morgan* v. *Bartlett*, [W. Va. App.] 83 S. E. 1001; note L. R. A. 1915D, p. 300.)

In *Deitz* v. *Stephenson* (*supra*) we have a clear statement of the rule in equity. The court said: " That a contract for the sale of shares of private corporation may, under certain circumstances, be the subject of equitable jurisdiction for its specific performance, is well established. This occurs where the value of the stock is not easily ascertainable, or the stock is not to be obtained readily elsewhere, or there is some particular and reasonable cause for the vendees requiring the stock contracted to be delivered; but if the stock contracted to be sold is easily obtained in the market, and there are no particular reasons why the vendee should have the particular stock contracted for, he is left to his action for damages."

It is unnecessary to review the elements of this contract, the reasons why it was executed, the future expectations of profits due to the efforts of the plaintiff's testator himself, and many other facts and circumstances, aside from the fact that there was no ascertainable value of the stock in any market, to satisfy the court that there was no adequate remedy at law.

It has already been held that we have here a valid and enforcible contract, in writing and under seal, based upon an adequate consideration. Both Mr. Brown and Mr. Lipe failed to perform so much of their part of the contract as required them promptly to transfer these shares of stock upon the books of the Brown-Lipe Gear Company. It may be assumed that Mr. Parsons at that time could have demanded the transfer, and that he could have brought an action then for the specific performance of that part of the contract which involved the issuance of the certificates of stock. This he did not do. The contract itself was rather unusual in some respects. It was perfectly all right between men of such friendship and mutual confidence as existed between these three men, but of doubtful wisdom if one considered the consequences of death, particularly of Mr. Parsons. The contract provided that Messrs. Brown and Lipe would promptly transfer the shares upon the books of the Brown-Lipe Gear Company to Mr. Parsons; that they were to deliver these shares to him was not specifically stated in the agreement; but was it implied? There is no provision that Mr. Parsons should turn over the certificates of stock to Messrs. Brown and Lipe to be held by them until they were paid for; but was this implied when they agreed to " promptly transfer *on the books* " of the company these shares? There was provision that if Mr. Parsons should sell the stock or impair the title thereto the entire balance due in payment therefor should forthwith become due and payable. This would imply that the certificates were to be issued and delivered. Evidently the delay was

caused by some justifiable hesitancy actually to issue and deliver the certificates; hence the effort to implement the contract in this respect by the agreement of April 16, 1924 (Exhibit 4). No doubt Mr. Parsons felt the force of this situation, and it is possible and probable that if he had then sought for specific performance of the contract a court of equity might have attached, as a condition thereto, a provision against the perilous exigencies. The contract was, on its face, to run for a considerable time; when the dividends would have paid up the amount of the purchase price was clearly speculative. Mr. Lipe and Mr. Parsons signed the agreement of April 16, 1924, which cleared away the perils lurking in the event of death of a party. For reasons unknown, Mr. Brown did not sign that agreement, although he apparently was requested so to do. Later, Mr. Brown wrote the letter of cancellation or repudiation. Whether Mr. Lipe knew of this letter does not appear, but during his lifetime he did not attempt to cancel or repudiate his agreement, but, on the contrary, manifested a disposition to fulfill. Mr. Parsons continued as general manager of the Brown-Lipe Gear Company. Mr. Brown and Mr. Lipe were very wealthy men, each several times a millionaire; they were Mr. Parsons' friends; he had confidence in them; he was in no peril just because they did not deliver certificates of stock over to him. There was no time when either Mr. Brown or Mr. Lipe transferred to others said shares, excepting a share or so transferred to their sons; Mr. Parsons knew that they continued in possession of the stock; he was on the board of directors, was an officer of the company, and knew all about its affairs and the status of the capital stock. There was no time when either Mr. Brown or Mr. Lipe placed themselves in a position where their power to fulfill their contracts was in any wise affected, and they were abundantly able to fulfill their agreement; so he did nothing.

Clearly, neither the act of Mr. Brown in seeking to repudiate the contract nor the act of the executors of the Lipe estate in attempting to place themselves in the same category as was Mr. Brown by likewise writing a letter of repudiation in any wise of itself affected the rights of Mr. Parsons under the contract. Neither party, alone, by his own act, could defeat the contract. The parties made no agreement for cancellation. Each held possession of his contract. Mr. Parsons brought no action for delivery of the certificates, nor did Mr. Brown or Mr. Lipe bring any action to cancel the contract. Mr. Parsons continued undisturbed in his position of general manager till his death. The *status quo* was maintained.

Having endeavored to cut through the underbrush and to penetrate the legal intricacies which have involved counsel in extensive discussion and in voluminous expressions in briefs, may we now inquire whether Mr. Parsons has defeated the right of his widow and his executors to ask specific performance of the contract of October 2 and 3, 1923, by laches, acquiescence in the attempted repudiation, or any acts of waiver or estoppel?

The determination of the questions which remain depends upon the effect to be given to conduct and sayings of Mr. Parsons. These acts and sayings have been set forth in the statement of facts, and will here be summarized.

(1) Mr. Parsons continued in the position of general manager and treasurer of the company up until the time of his death, October 31, 1928.

(2) He made unsuccessful efforts to dispose of the stock of the company as he was required to do by the agreement.

(3) He joined in the agreement of April 16, 1924 (Exhibit 4), with Mr. Lipe, which agreement Mr. Brown did not sign.

(4) He kept possession of the agreement in his safe or safety deposit box; he never surrendered it and never signed a written cancellation of it.

(5) Under his management, dividends were distributed to the stockholders of record to the extent of $725 per share during the period from October 3, 1923, to the time of his death in October, 1928, and in his capacity as general manager he sent out dividend checks to the several stockholders of record, accompanied by form letters in which, where the addressees of the letters held record title to the stock of the company, he said that he was sending dividends on " your stock; " this in the case of the dividends sent to C. S. Brown, W. Charles Lipe and Alexander T. Brown, so far as these letters of transmittal have been presented to the court.

What did he say by word or writing? The record is devoid of any conversations in the case between Mr. Parsons and Mr. Brown or Mr. Lipe, as it is devoid of any evidence of any written communication on the subject between the parties after the respective letters of repudiation; it is devoid of any oral conversations or statements of Mr. Parsons, excepting two; one with LeRoy B. Williams and the other with Stewart F. Hancock.

The conversation with Mr. Williams was offered in evidence by the defendants and received, under objection of the plaintiff. This conversation was in all probability after Mr. Brown's letter to Mr. Parsons of June 9, 1924. Mr. Williams testifies that he asked Mr. Parsons, *"How are you getting along with Mr. Brown?"* and

that Mr. Parsons smiled and said, " *We have decided to forget for the present.*"

The conversation of Mr. Hancock with Mr. Parsons was after the death of Willard C. Lipe, and, as attorney for the Willard C. Lipe estate, Mr. Hancock testifies that he had asked the son, W. Charles Lipe, to find out what, if anything, Mr. Brown had done (so apparently, Mr. Lipe did not know what Mr. Brown had done); " that Mr. Lipe had reported to me that he had found out from *some member of the Brown family* that Mr. Brown had served a notice of cancellation and that if I would go to see Mr. Louis Waters, Mr. Waters would tell me all about it; that after that talk with Mr. Charles Lipe I had gone over to see Mr. Waters; that Mr. Waters in substance had told me that Mr. Brown had come into his office — that is my recollection of what I said to Mr. Parsons — sometime during the month of the preceding May, had brought in this last document of April, 1924, had also brought in with him the two documents of October, 1923; that Mr. Waters told me that he had read the two documents of October, 1923, and explained what they meant to Mr. Brown; Mr. Brown replied that he did not understand those two documents of October, 1923, to mean what Mr. Waters said they meant and that thereupon Mr. Brown had told Mr. Waters to prepare a notice of cancellation; Mr. Waters had done so and Mr. Waters had shown me a copy of the Brown notice of cancellation; that I had a copy and that *Mr. Waters had told me that so far as he knew nothing had happened or been said between the Brown family or himself and Mr. Parsons after the service of the notice of cancellation.*" This is what Mr. Hancock says that he told Mr. Parsons; and then follows much more, of which the following is of interest: " that I had then taken the matter up with Charles Lipe and told him what Mr. Waters had told me, had shown him a copy of the notice of cancellation that had been served on behalf of Mr. Brown and had asked him what his attitude was in the matter; that Mr. Charles Lipe had asked me what I thought the legal effects of the document were and that I had told him and that I told Mr. Lipe that in my opinion they were in form a promise to make a gift and could not be enforced; that I then asked Mr. Lipe what he wanted done about the transactions and Mr. Lipe had said in substance to me that *in view of the small earnings of the company,* the salary that had been paid to Mr. Parsons, the twenty-five thousand dollar gift that his father had made to Mr. Parsons in the preceding month of April, that he felt he was under no more obligations to Mr. Parsons and that we had legally the same right to cancel that Mr. Brown had. * * * I told Mr. Parsons

that he must appreciate that the executors of the estate and myself as attorney must be informed as to whether any claim was being made by him against the estate; that it would have a bearing upon the relations with the Brown-Lipe Gear Company, which would have some relation to our preparation of our returns for tax purposes, and that I was up there to find out what his attitude was because depending on what he said would be the course of action or the form of notice which we might consider appropriate and fit under the circumstances. I also told Mr. Parsons that I had had several talks with Mr. A. T. Brown; that I had written Mr. Brown a letter incorporating one of the talks; that Charles Lipe was very anxious that the board of directors should be increased so that I might go on the board as a representative of Charles Lipe and know something about the business and be able to advise him and that he had suggested that Mr. Julian Brown, who was not a member of the board of directors, should also be added to the board of directors; that *Mr. Brown had stated that he would have no objection to me going on the board of directors; that he wanted to discuss the matter concerning Julian with Mr. Parsons and possibly with Mr. Waters* and that he would do so; that I had written a letter to Mr. Brown at his request and *which Mr. Brown stated that he was going to show to Mr. Parsons and that I hoped when Mr. Brown discussed the matter with him that he* would favor such a change because *I stated that I knew nothing about this company* and *not likely to know very much about it except from hearsay unless there was some opportunity of my obtaining first hand information.* I also said to Mr. Parsons that this *Brown-Lipe Gear stock was going to be the most valuable asset of the Lipe Estate; that the inheritance tax and the transfer tax were going to be heavy* and that from all the discussion that I had heard, I had a notion that the stock might not be worth book value and that I wanted his permission to say to Mr. Bourne, the accountant, that Mr. Bourne was at liberty to talk to me just as frankly and answer my questions just as fully as if he were talking to Mr. Parsons, stating that I understood that Mr. Bourne considered that the retainer of his firm originated with Mr. Parsons personally " and so forth. " That is the substance of what I said to Mr. Parsons on anything that I considered important or very material here. Mr. Parsons' reply in substance was that as to the proposition to increase the board of directors of the company, *he was very much interested in Charles Lipe; that he would have no objection to me as a director;* he would have *to think a little bit further about the suggestion about Julian being made a director and he would be glad to talk to Mr. Brown about it* and would be glad to talk to me

about it further; that whether that change was made or not I should feel free to ask him for any information at any time. On the subject of this notice or these contracts of October, 1923, he stated *that his relations with Mr. Lipe and with Mr. Brown had been close and friendly over a long period of years; that he would not consider doing anything that was not entirely satisfactory and pleasing to them; that when he received the notice of cancellation from Mr. Brown he thought that ended the whole matter so far as he, Mr. Parsons, was concerned.* So far as Mr. Bourne was concerned that I had his full authority to tell Mr. Bourne that Mr. Bourne, with his full approval, could furnish me any information that he had and give me details as to anything that might otherwise be considered more or less confidential. I said to Mr. Parsons that *if it were my own personal matter I might be willing to accept his statement that he was making no claim on these contracts without anything further, but considering that I was the attorney acting for executors I felt that the matter should be done in a business way and, therefore, that I would send him a formal notice of cancellation but I would make it as tame and mild as I could and still make the proceedings a matter of record.* He said he was a lawyer himself and appreciated that a lawyer had to handle things in a proper way." In other words, all Mr. Hancock says that Mr. Parsons said on the subject of the contract was that " when he received the notice of cancellation from Mr. Brown he thought that ended the whole matter so far as he, Mr. Parsons, was concerned; " and further, that when Mr. Hancock suggested sending him a formal notice of cancellation he said that " he (Parsons) was a lawyer himself and appreciated that a lawyer had to handle things in a proper way."

It will be noted there was here no request that and no offer by Mr. Parsons to surrender up for cancellation the agreements, which, if the matter was to be done in a " business way," was the only businesslike way in which it could have been done; and this, if such was the desire of the parties, was the legal way in which it should have been done.

What did Willard C. Lipe do in respect of this agreement? Absolutely nothing, excepting to make every effort on his part to carry it out, having such an appreciation of Mr. Parsons' worth that he, even in addition to the provisions of the agreement, gave him his personal check for $25,000.

What did Alexander T. Brown do? Absolutely nothing, excepting to write the letter of repudiation, but he suffered the man whom he had charged with fraud to manage his business until he died while still in his service. He took no steps to have the agreement canceled.

I can come to no other conclusion, on account of the continued relations of these parties, than this: (1) That Mr. Lipe at all times had the honorable purpose to carry out his contract to the letter, and (2) that Mr. Brown, alone and by himself, without the influence of others, probably members of his family, would have gladly done the same thing, but that he was between the Scylla of a breach of the contract on the one hand and the Charybdis of family turmoil on the other, I can reach no other conclusion, from the evidence in this case, where parties of such conspicuous ability, of such high character and standing, dealing with a matter of such grave importance, did so little as they did in this case in the presence of differences which if they really existed were so vital as to impair their cordial relationships, which were not impaired. This view is only emphasized by the fact of the testimony of Mr. Williams when he said that Mr. Parsons said, " We have decided to forget for the present; " in other words, that " we " (meaning Mr. Brown and himself) had decided to leave the matter *in statu quo* for the present.

In considering the defenses set up by the defendant to defeat the contract or to bar a remedy thereunder, to wit, acquiescence in the notices of repudiation, waiver, estoppel and laches, all of these questions are to be considered in the light of the circumstances in which the parties were placed at the time of the contract and after the notices of the defendants' testators of their repudiation thereof.

When these notices of repudiation were received by Mr. Parsons, what should he have done? Under the contract, these 190 shares of the capital stock of the Brown-Lipe Gear Company were to be paid out of dividends of the corporation. Mr. Parsons was the general manager of the corporation, having practically full charge of the conduct of its business; he could have brought an action, after demand, for specific performance of that part of the contract which required the transfer of the stock upon the books of the company. We have already pointed out the perils lurking in this contract so far as Mr. Brown and Mr. Lipe and their successors were concerned, and no doubt, properly interpreting the contract and the spirit and purpose of it, the court, in decreeing specific performance, would have attached proper conditions; but such an action brought by Mr. Parsons against Mr. Brown and Mr. Lipe would have indicated such a disagreement between the parties that his position as general manager would have become untenable. There was implicit in this agreement the idea that Mr. Parsons should continue in his management of the company; the fulfillment of his contract demanded his continuance; otherwise he

would suffer defeat and possible ruination. He for years had been the trusted employee of Mr. Brown and Mr. Lipe. To leave matters just as they were simply placed him in a position where he was taking the responsibility of the financial integrity of both Mr. Brown and Mr. Lipe; there was no financial risk involved in leaving the certificates of stock involved in the transaction in the hands of Mr. Brown and Mr. Lipe. And this gives color to his statement to Mr. Williams when he said, " We have decided to forget for the present." This statement is a key if not *the* key to his attitude.

In the period from July 21, 1924, to October 17, 1928, under the management of Mr. Parsons the earnings of the company were such that dividends to the amount of $725 a share, or, in total, $1,087,500, were paid; and after the payment of these dividends and in December, 1928, shortly after the death of Mr. Parsons (October 31, 1928), but before the date of the death of Mr. Brown (February 1, 1929), the capital stock of the company was sold for $3,400,000, or at the rate of $2,266.66 a share, against the option price of $1,550 a share named in the contract of October 2, 1923, or a difference of $716.66 a share, or a total on the 1,500 shares of $1,174,990; to which add the amount of the dividends during the above period, $1,087,500, making a total gain of $2,262,490. The wisdom of Mr. Brown and Mr. Lipe in not bringing actions for cancellation is demonstrated. Neither were either Mr. Brown or Mr. Lipe placed at any disadvantage; their position, so far as security was concerned, was not weakened, but was strengthened, when Mr. Parsons left the stock in their names. The *status quo* was best for all.

Furthermore, in reference to the income taxes, here we have a very confused question, confusing both to Mr. Parsons and to Messrs. Brown and Lipe, so far as dividends were concerned. On the one hand, if the contract were not performed by Mr. Parsons, then the dividends were income in the hands of Messrs. Brown and Lipe and nothing in the hands of Mr. Parsons. No one could tell when the contract would be performed or when the dividends would equal the amount of the purchase price of the stock stated in the contract. If Mr. Brown and Mr. Lipe demanded payment of the balance of the purchase price under the contract within any time that could be determined as a reasonable time, Mr. Parsons, according to his financial status, might have been in a very serious position; furthermore, the parties might agree to a modification of the contract. Mr. Parsons may have taken the view, upon a question which has never yet been clearly decided in the courts of this State, and, so far as I know, has never been

interpreted, excepting in the instant case, that there was an identity, created under the Personal Property Law, of certificates of stock with the shares of stock, or that the contract had not passed the legal title to the stock, and that until that was done it would be a matter of grave doubt as to whether dividends paid were income within his hands or not. So far as the stock was concerned, it was an entire contract; he could not, under the agreement, take up so many shares at a time as the dividends purchased; he had to pay for all of the shares of stock sold him under the contract, or none. So, in the case of Mr. Brown and Mr. Lipe, the facts were as well known to them as they were to Mr. Parsons, and they may well have said, under these circumstances we will treat these dividends as income, which is the only safe thing we can do, until there has been fulfillment of the contract.

Such was the background, in the light of which must be determined the questions of laches, abandonment, estoppel, etc.

Laches is an equitable defense. It, therefore, will not bar a recovery where there is a reasonable excuse for one's failure to take action in the assertion of his rights; and this is particularly true where any delay is due to the intimate personal relations existing between the parties, and where, as here, there was a high degree of confidence reposed by them in each other. Here courts manifest the utmost of leniency. (10 R. C. L. p. 403.)

The plaintiff or her testator, under the facts and circumstances of this case, has not been guilty of laches, and on that count these actions are not barred. Laches is an equitable defense, apart and separate from the defense of the running of the Statute of Limitations. As a defense it does not arise merely because of lapse of time, but rather arises where lapse of time has occurred under such circumstances that the court feels that the remedy of specific performance should be denied and that, therefore, the court should remain passive and should do nothing, leaving the parties just where they were. There is involved in the validity of laches as a defense the idea that the defendant has been led into a course of action to his damage in respect of the substance of the contract, by reason of the delay; it is never available in aid of an inequity, but only to prevent injustice.

" So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly, within limits allowed by law; but when, knowing his rights, he takes no step to enforce them until the condition of the other party has, in good faith, become so changed *that he cannot be restored to his former state, if the right be then enforced,* delay becomes inequitable, and operates as an estoppel against the assertion of the right.

When a court sees negligence on one side and injury therefrom on the other it is a ground for denial of relief. (10 R. C. L., Equity, § 143.) "

In *Groesbeck* v. *Morgan* (206 N. Y. 385, 389) it is said: " No doctrine of equity jurisprudence is better settled than the rule that specific performance is not a strict legal right and is never granted when the lapse of time renders such relief inequitable in its consequences, or as many judges have phrased it, ' against equity and good conscience.' * * * The defense of laches, in a suit for specific performance, is to be considered wholly independent of the statute of limitations. Although the action is brought within the period prescribed by the statute, it may have been so delayed as to preclude the granting of equitable relief, and, if so, the complainant must be relegated to his action at law for damages. *In determining whether such delay is fatal in the domain of equity, regard must always be had to the peculiar circumstances of each case.*" There is also a distinction to be borne in mind between those cases where parties seeking simply to enforce a legal right based upon a contract in writing and under seal and those cases where the right to a relief has been awakened by conduct of parties defendant and there has been delay in prosecution of the right so awakened.

In *Pollitz* v. *Wabash R. R. Co.* (207 N. Y. 113, 130), in holding that laches was not a bar to the cause of action alleged, the court said: " The plaintiff, in behalf of the corporation, is seeking to enforce in equity a legal right, to wit, the right of the corporation to recover from the individual defendants the damages resulting from their misuse of its assets. The favor or the discretion of the court is not appealed to, as was the fact in *Groesbeck* v. *Morgan* (206 N. Y. 385) which was an action for specific performance by a vendee against the vendor wherein we held that laches was a defense independent of the statute of limitations. In the present case resort is had to equitable jurisdiction for the purpose of ascertaining through an accounting the sum of damages. In *Coit* v. *Campbell* (82 N. Y. 509, 514) Judge RAPALLO, writing for the court, said: ' It is a well established principle of equity, that where there is a discretion to bar a right on the ground of delay, the courts will, in the exercise of that discretion, use the Statute of Limitations as a rule to guide their action. * * * Of course, this principle applies only to cases where the relief asked *relates to a matter of right*, and not to *applications to the favor of the court*, or for its indulgence in *cases of default or excusable neglect*. These cases are purely discretionary, and any laches which may to the courts seem sufficient, is cause for denying relief.' The alleged cause of

action is barred by the statute of limitations applicable to it, and not by laches."

Again, in *Calhoun* v. *Millard* (121 N. Y. 69, 82) it was said: " The ten years' limitation was primarily designed to shield defendants, * * * and it must be true that a court, in the exercise of its equitable jurisdiction, could not entertain or enforce a cause of action barred by the statute, and not within any exception, acting upon any general equitable considerations. But, in enforcing purely equitable remedies, depending upon general equitable principles, unreasonable and inexcusable delay is an element in the plaintiff's case, which a court of equity always takes into consideration in exercising its discretion to grant or refuse relief, and is not a mere collateral incident. Where there is a remedy at law, whereby the plaintiff can prosecute or defend his legal right, the refusal of relief leaves the parties where they were. If there are special circumstances which may change the situation of the plaintiff to his injury, unless the equitable remedy is interposed, this fact may be considered. But the right of the court to deny relief upon equitable grounds, for long delay, although short of the statute period of limitation, is in the nature of a defense, and is not, we think, taken away by the statute. *There may be a well-founded distinction between the case of an application for an equitable remedy in aid of, or to enforce a legal right not barred by the statute*, and the case *where an exclusively equitable remedy is sought*, such as to restrain proceedings at law, or upon the principle *quia timet*, to deprive an adversary of the muniment of his alleged legal right, which he inequitably retains. In cases of the latter class, long delay or acquiescence, although short of the statute period for the limitation of equitable actions, may be a ground for refusing relief."

Applying these principles to the facts of the instant case, the defendants or their decedents suffered no injury of any kind on account of delay. The plaintiff here is seeking the enforcement in a court of equity of a legal right, to wit, the carrying out of a contract which was wrongfully repudiated in the Brown case by the decedent, and in the Lipe case, largely for form's sake, however, by decedent's executors. A wrong to the plaintiff's testator was done then and by the defendants' predecessors, and it does not appeal to the conscience of this court to allow the effectuation of a wrong on the principle of laches, when, under the circumstances of the case, there was no occasion for any action whatsoever until payment of the purchase price of the stock had been perfected.

Laches is an equitable defense to prevent injustice; it cannot be used in aid of injustice, under the circumstances of these cases,

where no one has suffered any damage which would justify a defeat in equity of contractual rights. Under the peculiar circumstances of this case, Mr. Parsons was not called upon to do anything, and his failure to do what he might have done, as distinguished from what he should have done, cannot be charged against him as laches. There can be no pretense that the present plaintiff did not act with reasonable promptness after the death of Mr. Parsons.

The evidence as to his conduct does not support the proposition that Mr. Parsons surrendered his contractual rights or that he acquiesced in the purpose of the letters of repudiation. These, especially the letter of Mr. Brown to him, constituted a great wrong; they were unjustified attempts to repudiate a solemn obligation of contract; they were not effectual for that purpose. Mr. Parsons, of course, as a lawyer, knew this.

The contracts were under seal; each of the parties had a triplicate original and held it in his possession down to the time of his death. There was no cancellation. This fact is not evidence of acquiescence in attempted repudiation, but of continuity of the contract. It would have been a simple matter for Mr. Brown and for the executors of the W. C. Lipe estate to have demanded from Mr. Parsons the surrendering up of the contracts or their cancellation by an instrument in writing of equal dignity, or, if there was disagreement, to have reached some accommodation of differences. No action for cancellation was brought by either Mr. Brown or the Lipe estate. It would be quite as equitable to set up their failure to act as an answer to the positions now being taken by their successors.

Stewart F. Hancock, attorney for the W. C. Lipe estate, testifies as to a conversation that he had with Mr. Parsons, in which he says that Mr. Parsons said to him that when he received the Brown letter of June 9, 1924, he (Parsons) thought that ended the whole matter. And it is upon this slender thread that the theory of acquiescence largely hangs in this case. Assuming that, after the lapse of years, Mr. Hancock has remembered this long conversation, of which he made no memorandum at the time, and that his memory has not been influenced by the natural processes of associations growing out of his living with these actions, and assuming that he has given his best recollection of the transaction and has accurately reported what Mr. Parsons actually said, referring to the letter from Mr. Brown of the 9th of June, 1924, " that his relations with Mr. Lipe and with Mr. Brown had been close and friendly over a long period of years; that he would not consider doing anything that was not entirely

satisfactory and pleasing to them; that when he received the notice of cancellation from Mr. Brown he thought that ended the whole matter so far as he, Mr. Parsons, was concerned."

As has been said before, there had been no cancellation of the agreement. That it was not done is evidence that Mr. Parsons did not consider that such a course would have accorded with the wishes of either Mr. Brown or Mr. Lipe when he said " that his relations with Mr. Lipe and with Mr. Brown had been close and friendly over a long period of years; that he would not consider doing anything that was not entirely satisfactory and pleasing to them." There can be no other inference drawn from this than that in the execution of the agreement of October 2, 1923, there was not anything done which at that time was not satisfactory to both Mr. Brown and Mr. Lipe. Then Mr. Hancock made no inquiry of Mr. Parsons as to whether he (Parsons) had canceled the agreement with Mr. Brown, for the reason, no doubt, that he knew that there had been no cancellation of the agreement; and he certainly knew that Mr. Lipe had never made any effort to cancel the agreement. He says Mr. Parsons said that when he received the letter of cancellation from Mr. Brown he (Parsons) " thought that ended the whole matter so far as he, Mr. Parsons, was concerned." Mr. Parsons did not say to Mr. Hancock that that ended the matter, but that when he received the letter he thought that ended the matter. He does not say that Mr. Parsons ever communicated such a thought to Mr. Brown, or that Mr. Brown ever knew what he thought. Thought is a mental conception; but what one thinks yesterday may, upon review, be different from what he might think tomorrow. Mr. Parsons did not say to Mr. Hancock that that ended the matter; nor, after he received the letter from Mr. Hancock, did he say that he thought that ended the matter; he made no reply to the letter from Mr. Hancock, and there is no evidence that he made any to the letter from Mr. Brown. Did Mr. Hancock think then that Mr. Parsons had acquiesced in the repudiation, or that he had assented to a repudiation of the contract by the Lipe estate? True, Mr. Hancock sent, in behalf of the Lipe estate, the letter of October 9, 1924; in that letter he makes no assertion that Mr. Parsons had agreed to a repudiation of it; he recites in the letter that he had found among Mr. Lipe's papers the contracts of October 2 and 3, 1923, and the proposed agreement of April 16, 1924; that he had talked with Mr. Brown, Mr. Waters and himself concerning the writings; that he had seen the formal rescission and repudiation of these purported contracts, served upon Mr. Parsons by Mr. Brown in April, 1924; and then, in explaining the basis of the cancellation, he says:

" We take this action upon the same grounds stated by Mr. Alexander T. Brown in his formal cancellation served upon you during the month of May, 1924." If Mr. Hancock had gathered at the time that Mr. Parsons had acquiesced in the repudiation of the contract by Mr. Brown, or was willing then to deem the contract with Mr. Brown and Mr. Lipe as of no effect, why did he not so state in his letter? As a lawyer and a business man dealing with a serious matter of contract, why did not Mr. Hancock do the normal thing and prepare a written instrument of cancellation and submit it to Mr. Parsons for his signature; or why at least at the end of his letter of cancellation on behalf of the Lipe estate did he not ask Mr. Parsons (if the matter had been closed up, or if he [Hancock] thought it had been closed up) to write him a formal letter to the effect that he made no claim against the Lipe estate on account of the agreement of October 2, 1923? This is what any lawyer, especially a lawyer of Mr. Hancock's recognized ability, would have done, if such were the fact, or if he had gathered the impression that such was the fact. In any event, there was no assent by Mr. Parsons to a repudiation of the contract by the Lipe estate, and there is no evidence of any statement of even Mr. Parsons' " thought " at the time. Instead of that, Mr. Hancock sends his repudiation letter, under cover of the " Dear Arthur " letter of the same date which reads: " I am enclosing herewith a formal cancellation of the contracts which you and I discussed on Wednesday." And then follows the provision that " you are to consider this as purely a business document, discharging what we consider to be the legal duty of the executors." And he also says that Charles Lipe " is willing to sit down with you, Mr. Brown and myself at any time and to discuss in the broadest spirit the future policy of the company in the matters concerning which we talked."

No other inference can be drawn from the incident detailed in Mr. Hancock's conversation with Mr. Parsons on the 8th of October, 1924, than this: that if his purpose in talking to Mr. Parsons was to procure a cancellation of this agreement, he failed to procure it, but wrote the letter of October 9, 1924.

The only result which followed out of this conversation was that Mr. Hancock had carried out the wishes of Mr. Charles Lipe and placed the Lipe estate in the same position in respect of the contracts that Mr. Brown was in.

An interesting thing about the conversation is that Mr. Hancock says that he received information of Mr. Brown's notice of cancellation not from Mr. Brown himself but from Mr. Charles Lipe, who had reported to him that he had found out this fact from some member of the *Brown family*. Mr. Hancock did not go to Mr.

Brown, but he went to Mr. Waters, the attorney who drew the Brown letter of cancellation; and it is interesting to note that Mr. Waters told Mr. Hancock at that time that after the sending of Mr. Brown's letter of June 9, 1924, so far as he knew, nothing had happened or been said between *the Brown family* and himself and Mr. Parsons after the service of the notice of cancellation. These statements bear out the inference I have heretofore drawn, that Mr. Brown, in sending the notice of June 9, 1924, was actuated by other influences than personal desire.

Valuable rights, set forth in solemn contract, involving on its face the transfer of property worth nearly $300,000, and, as it ultimately turned out, worth upwards of $400,000, may not be wiped out in this way.

While in this case oral testimony is being offered as to statements of a decedent, and conduct of the decedent is being shown, in an effort to defeat the operation of a written contract to which said decedent was a party, and it is not a case to establish a contract of a decedent by oral testimony and by acts, nevertheless the attitude of the court in reference to oral testimony as to statements, by interested parties, and as to conduct, should be the same in the one case as in the other. That attitude has been clearly defined. (*Hamlin* v. *Stevens*, 177 N. Y. 39; *Holt* v. *Tuite*, 188 id. 17; *Burns* v. *McCormick*, 233 id. 230.)

When Mr. Parsons and all the other stockholders signed the option (Exhibit 127) for the sale of all the stock of the corporation for $3,500,000, they agreed to sell all the stock of the corporation, " *whether standing in our name or not.*" The stockholders were few in number. There is no instance where there was any right to the stock in any other person than those in whose names it stood upon the books, excepting in the single instance of the rights of Mr. Parsons under the contract here involved. So that here was clear, positive evidence that at that time he was asserting his rights; moreover, it is evidence that all the parties knew that the contract of October 2, 1923, was in force; otherwise, why did they subscribe the words " whether standing in our name or not ? " We are talking here about the acts of Mr. Parsons. There is no direct evidence that there had been acquiescence by him in the repudiations, and there is no evidence " unequivocally referable " to acquiescence from which an inference of a purpose to surrender contract rights can be drawn. The only inference that can be drawn is that there had been no surrender by him of his rights under the contract.

There is no question of waiver of rights involved in this case, and it is unnecessary here to enter into extended discussion of the

refinements of distinction between waiver and estoppel. Waiver consists in the intentional giving up of a known right; it involves voluntary action to that end. There was no express waiver, and the distinction between waivers implied from conduct and estoppels is somewhat difficult to define. A distinguishing feature of waiver is that there shall be a positive intention to give up a right; it involves a definite and voluntary act, with full knowledge of one's rights, and none will be implied contrary to the intention of the party whose rights would be injuriously affected thereby unless the opposite party is misled to his prejudice into the belief that a waiver was intended. To make out a waiver of a legal right, there must be a clear, unequivocal and decisive act of the party showing such purpose, or acts amounting to an estoppel on his part. A waiver, to be operative, must be supported by an agreement founded upon a valuable consideration, or the act relied on as a waiver must be such as to estop a party from insisting on performance of the contract. (*Ripley* v. *Ætna Ins. Co.*, 30 N. Y. 136; *Prentice* v. *Knickerbocker Life Ins. Co.*, 77 id. 483.) There must be clear proof of the waiver, either by express declaration or agreement or by acts and conduct manifesting an intent and purpose not to claim one's rights. There are none of the elements of waiver present here.

Nor do I feel that there is any element of estoppel here which goes to the extent of destroying rights under the contract. If there be any element of estoppel it is equitable estoppel or estoppel *in pais*. The indispensable elements of estoppel are ignorance on the part of the party who invokes it, a representation by the party estopped which misleads, and an innocent alteration of position, in reliance upon such representation, to one's damage. It is practically impossible to make a definition of estoppel which will apply to all cases, because estoppel rests largely upon the facts and circumstances of the particular case. Generally, however, it may be said that a person making a representation or assuming a position which if not maintained would result in an injustice to another who, having a right to rely upon the representation or position assumed, has done so to his injury, is estopped. (*Welland Canal Co.* v. *Hathaway*, 8 Wend. 480; *Frost* v. *Saratoga Mut. Ins. Co.*, 5 Den. 154; *Brown* v. *Bowen*, 30 N. Y. 519; *New York Rubber Co.* v. *Rothery*, 107 id. 310; *Rothschild* v. *Title Guarantee & Trust Co.*, 204 id. 458.) It must have reference to the existence of some present or past fact. A mere promise to do or not to do something in the future cannot work an estoppel unless the promise or engagement is one on which the party to whom the promise or statement was made has acted to his disadvantage so that his status has been

changed. There is in it an element of fraud, actual or constructive; and it has been said that such fraud lies beneath every equitable estoppel. The party invoking the estoppel must prove that he has been misled, to his prejudice. (*Trustees, etc., of Brookhaven* v. *Smith,* 118 N. Y. 634.) Silence alone will not work an estoppel, but the silence must be under such circumstances that there are both specific opportunity and a real or apparent duty to speak. (*New York Rubber Co.* v. *Rothery,* 107 N. Y. 310.)

In the instant case there was no possible deception; all the facts were as well known to one party as to another. The aggressor and the wrongdoer was Mr. Brown, and, subsequently, the executors of the W. C. Lipe estate. Mr. Parsons' attitude or his duty was in no wise altered by anything that they said. The record is devoid of any element of deception on the part of Mr. Parsons. Mr. Brown knew, or should have known, that his attempted repudiation of the contract was not effective; the executors of the Lipe estate also knew the same thing; and they knew all the facts just as well as Mr. Parsons did. At the first opportunity that he was called upon to do so, Mr. Parsons asserted his rights. When the rights of third parties became involved he asserted his rights. It would certainly be an anomaly in equity jurisprudence if a party who deliberately attempted to repudiate his solemn obligation should in an action to enforce his promise be allowed to set up the silence of the party to be estopped as an estoppel in aid of the effectuation in equity of his own wrong. Certainly, there are here no elements of estoppel. The sending out of dividend checks by Mr. Parsons was an official act. There must be a clear distinction between the acts of Mr. Parsons in his official capacity as an officer of a corporation and his acts in reference to his personal affairs. Acts that he was bound to perform in his official capacity as an officer of the corporation were one thing, and his personal conduct quite another.

The only basis upon which any damage to the defendants can be predicated is the income taxes paid. If it could be held that there was an element of estoppel here, the remedy is not to be found in the setting aside of the contract, but if the parties defendant have been altered in their position by reason of any acts of estoppel the amount of their damage is ascertainable. Equitable estoppel does not come into being as an equitable defense excepting where justice to the rights of others demands; it is never intended to work a positive gain to the other party, such as would be worked here if it were allowed to destroy the contract; its function is to protect from loss which, excepting for the estoppel, one could not escape, and should be limited in its effects to what may be necessary to put the parties in the same relative position which they would have

occupied if the estoppel had never existed. (*Wormser* v. *Rubinstein*, 89 Misc. 388; *Lyon* v. *Morgan*, 64 Hun, 111; *Llano Granite & Marble Co.* v. *Hollinger*, [Tex. Comm. App.], 212 S. W. 151.)

Now the only damage which Mr. Brown or the Lipe estate suffered was that which arose by reason of their payment of taxes to the Federal and State governments. This is the only element of disadvantage which is claimed; and, this being so, the only extent to which equity should go would be to offset against any recovery by the plaintiffs in these cases the amount of such damages, but not to wipe out the whole contract. It is unnecessary to resort to the doctrine of estoppel to formulate the basis of such an estoppel; from the evidence before me and from the arguments of counsel, I cannot determine as to its amount; but the principle underlying the basis of the offset is founded upon general equity rather than upon a nomenclature; " he who seeks equity must do equity." The relations of the parties in this respect must be defined and their rights determined as they would have been if the contract of October 2, 1923, had been carried out according to its terms. If that had been done, Mr. Parsons would have received his dividends as income; Mr. Brown and Mr. Lipe or the Lipe estate would have received payments from Mr. Parsons as payments on capital account. As the matter now stands, on account of the doubt, as hereinbefore noted, as to what these dividends were, whether capital or income, the effect has been that Mr. Brown and his estate and the W. C. Lipe estate have paid the income taxes which Mr. Parsons, on a strict carrying out of the contract according to its terms, would have paid; and in determining the amount to be paid over out of the funds now on deposit with the First Trust and Deposit Company as trustee under the agreements of December 12, 1928, which moneys, according to the terms of such agreements, stand as representative of the 190 shares of stock of the Brown-Lipe Gear Company, there must be deducted the amount of the income taxes paid (in the Brown case by Mr. Brown and his estate) which Mr. Parsons would have paid had the dividends been paid directly to him as income; and the like measure applies to the Lipe estate. The amount is capable of calculation, but not upon the facts now before the court. This is a matter upon which the parties can agree. Neither the Federal nor the State government has lost anything; they are not parties here; so far as they are concerned, the taxes have been paid.

Once the execution and validity of the contract was established, the burden rested upon the defendants to satisfy the court by a fair preponderance of evidence that there were grounds in equity

why the contract should not be enforced. This they have failed to do. Attention has herein been called to the weight of that burden, as against deceased persons. Generally, it has been stated as follows: " The burden of proof rests on the party setting up an estoppel to show the grounds on which it rests, * * * so the evidence to support it must be clear, precise and unequivocal. So, where an estoppel *in pais* is sought to be established by evidence of the declarations and admissions of persons made long anterior to the trial, such evidence cannot be too carefully scrutinized by the court * * *. It has been declared to be the most dangerous species of evidence that can be admitted in a court of justice and most liable to abuse." (10 R. C. L. p. 845.)

At the time when the contract was drawn the price per share agreed upon between the parties was doubtless an honest price for the stock at that time, particularly for a minority interest. Considering the relationship of these parties at the time when the contract was made, and bearing in mind that when Arthur E. Parsons entered into the employ of Willard C. Lipe and Alexander T. Brown he gave up what must have been a lucrative practice at the law and a profession to which up to the time of such employment he had devoted his life, and that he rendered faithful service from that time (in 1917) to the date of his death to the Brown-Lipe Gear Company, and considering the relatively small and uncertain amount which could be received under the agreement, and the fact that if anything was to be received it would be through the efficient and successful administration of the affairs of the company by Mr. Parsons, and the conduct of the parties to the agreement with respect thereto up to the time of their several deaths, it would be working a grave injustice to deny the prayer of the plaintiff for the specific performance of this contract in these cases. Finding as we have that there are no legal or equitable grounds for denying plaintiff's prayer in either of these cases, that prayer is granted; but what of the remedy?

According to the agreement of December 12, 1928, between Alexander T. Brown and the plaintiff in the Brown case, the proceeds of the sale under the option of November 26, 1928, of the ninety-five shares of stock of the Brown-Lipe Gear Company, to wit, the sum of $215,332.70, were deposited with the First Trust and Deposit Company, with the proviso that since October 2, 1923, there had been received by said Brown, on said ninety-five shares of stock, dividends to the amount of $68,875, or $725 per share, leaving a balance to be paid, according to the terms of the agreement of October 2, 1923, of $71,012.50, or $747.50 per share. This amount, being due upon the contract, was, according to the agree-

ment, to be paid over to Alexander T. Brown, leaving a balance on hand of $144,320.20 to be paid according to the determination of the court herein. In the Lipe case, under an agreement in the same terms, the amount on deposit, subject to the determination of the court in that action, with said First Trust and Deposit Company, is the like sum of $144,320.20.

The decision of the court in the Brown case is that the plaintiff is entitled to the payment by the First Trust and Deposit Company to her of the sum of $144,320.20, with any accumulations of interest, less the deductions growing out of income tax payments as they may be determined herein.

The decision of the court in the Lipe case is that the plaintiff is entitled to the payment by the First Trust and Deposit Company to her of the sum of $144,320.20, with any accumulations of interest, less the deductions growing out of income tax payments as they may be determined herein.

Costs allowed to plaintiff in each case.

The judgments to be entered herein and in accordance herewith should be final and not interlocutory; and unless the parties stipulate the amount of deductions to be made, as herein directed, further evidence shall be taken and a determination reached before the court or before a referee to be appointed for such purpose, as may hereafter be determined. If counsel within ten days do not agree upon and stipulate into the record the amount of the deductions on account of income taxes paid, the court will fix a time and place of hearing to determine the amounts thereof, or, as the exigencies may require, for the appointment of a referee in each case to take the proofs and report, with his opinion, such amounts.

The plaintiff in each case will prepare findings of fact and conclusions of law in accordance herewith, to be settled, if not agreed to, upon two days' notice.

Judgment accordingly.