ERIC H. HUGGINS et al., Appellants, *v.* CASTLE ESTATES, INC., Respondent.

Fourth Department, March 4, 1974.

*Kernan & Kernan* (*Earle C. Bastow* and *John E. Hunt* of counsel), for appellants.

*Durr & Keinz* (*Donald F. Keinz* of counsel), for respondent.

SIMONS, J.  Appellants are the owners of residential property in a subdivision owned and developed by respondent.  Respondent sold a house and lot on Imperial Drive to Mr. and Mrs. Huggins for $27,000 in November, 1968 and sold Mr. Lawrence a lot two doors north on Imperial Drive in August, 1968 for $5,000.  Their deeds restrict the property to residential use.  Mr. Lawrence constructed a house on his lot and transferred the property into tenancy by the entirety when he subsequently married.  The deeds executed by respondent contained no metes or bounds of the lots but referred to them solely as Lots Nos. 14 and 16 respectively of section 6 of Castle Estates as shown on a duly filed map and "subject to all restrictions, covenants, easements, and rights of way of record."  Among other things, the map showed definitive boundaries of the lots, streets and utilities, and described and delineated the setback line for the houses.  Part of section 6 shown on the map was the land on the easterly side of Imperial Drive across the street from appellants' property.  It was described as property of Castle Estates, Inc. and underneath that wording, in letters of equal size, was the printed legend "R-2 Zoning".  R-2 is a two-family residence zone under the Town of New Hartford zoning ordinance.  In 1968 R-2 was the existing zoning for section 6, a classification successfully urged upon the Town Board by Mr. Kenny, the respondent's president, at the time he was developing the property during the years 1958–1963.

It is this area, across the street from appellants, which respondent now proposes to sell for $45,000 to Ibbotson Motors, Inc. for use as an automobile sales and service facility to be constructed at an estimated cost of $100,000.  Such a sale was made possible when, in June and July, 1969 during consideration of a general zoning revision of the town, the zoning of this parcel (now referred to for convenience as the Ibbotson property) was changed, apparently without notice, from residential to commercial.

Appellants, unaware of any change in the zoning until the Ibbotson proposal developed in 1971, now ask the court to

impress a negative easement requiring residential use of the Ibbotson property opposite their homes on Imperial Drive or, in the alternative, that respondent be estopped from deviating from residential development of it. They testified that when they bought their lots, Mr. Kenny assured them that this property would be developed only for residential use. Respondent contends that there is no contractual restriction on the commercial development of the Ibbotson property and even if Mr. Kenny represented that the land was limited to residential use, any such oral representation is not binding upon it.

Negative easements are explained in *Trustees of Columbia Coll.* v. *Lynch* (70 N. Y. 440, 447–448): " The right sought to be enforced here is an easement, or, as it is sometimes called, an amenity, and consists in restraining the owner from doing that with, and upon his property which, but for the grant or covenant, he might lawfully have done, and hence is called a negative easement, as distinguished from the class of easements which compels the owner to suffer something to be done upon his property by another."

As a part of the consideration for the sale of some of his property, a grantor may impose a restriction upon the use of his remaining property. The question here is whether the appellants established by the evidence that the respondent bound itself to limit development of the Ibbotson property to R-2 zoning uses by such a negative easement.

It is contended by respondent that the only building restriction on the Ibbotson property is to be found in the oral representations by Mr. Kenny and in the unsigned subdivision map, and that these are unenforceable for failure to comply with the Statute of Frauds. The statute (General Obligations Law, § 5–703) provides that an estate or interest in real property may not be created except by a conveyance in writing subscribed by the grantor. But it has long been established that a reference in a deed to a particular filed plat makes the plat in effect part of the conveyance (*Seamans* v. *Gulf Refining Co.*, 237 App. Div. 202, affd. 264 N. Y. 433; *Glover* v. *Shields,* 32 Barb. 374; and see generally *Crabtree* v. *Elizabeth Arden Sales Corp.*, 305 N. Y. 48, 55–56). The agreement was set out in writing and the unsigned portion, the plat, was unequivocally referable to appellants' deeds, overcoming any suggestion of fraudulent invention and satisfying the Statute of Frauds. Although parol evidence is permissible, and may in some cases be necessary, to connect an unsigned document with that which is signed, the writings are undisputably connected here and oral testimony

was not necessary for that purpose. The deed was meaning-less without reference to the plat, for it contained no dimensions or courses for the lots, no data on the streets or utility locations and no building setback restrictions. The limiting and descriptive terms of the plat were enforceable with as much effect as if they were expressly included in the deed. The complete agreement between the parties when examined in light of all the existing circumstances, imposed a negative easement of "R-2 Zoning" on the respondent's land across the street from appellants. The rule is stated in American Law of Property (vol. 2, § 9.25, p. 408):

" In many cases the written provisions creating the equitable servitude are not found in the deed itself, but were inserted by the subdivider in a plat of the subdivision which has been duly recorded. In such cases if the subdivider subsequently conveys the lots by reference to the plat, the written building restrictions appearing on the plat become incorporated by reference into the deed. This has the effect of satisfying the requirements of the statutes of frauds to the same extent as if these building restrictions had been expressly repeated in each deed by the subdivider."

Respondent contends that the intention to establish a restrictive covenant must be clearly shown and the claimed restriction fails on that ground. In interpreting the documents it should be borne in mind that the grantor prepared them. It alone is responsible for the subdivision plan and the documents and deeds implementing it and under those circumstances an easement may be more readily implied in favor of the grantee (25 Am. Jur. 2d, Easements and Licenses, § 24). If the legend had been stated in the familiar language of easements, there would be less doubt of the parties' intention. Because it was not, the trial court appropriately received parol evidence on the subject to resolve any ambiguity (*Balkum* v. *Marino,* 299 N. Y. 590).

This extrinsic proof of the surrounding circumstances is persuasive evidence that the respondent agreed to be restricted to residential development of the Ibbotson property by the legend on the map, just as appellants are bound by the residential restrictions in their deeds (cf. *Brown* v. *Fred J. Hovey, Inc.,* 284 App. Div. 1094). It was established that the subdivision as originally conceived by respondent was for general residential development. As already noted, Mr. Kenny successfully urged that position at early zoning hearings. Subsequently, he proposed various zoning changes for the subdivision to the Town Board but it does not appear that he ever publicly

or privately took the position that the Ibbotson tract should be changed from residential to commercial. Furthermore, although Mr. Kenny frequently participated in zoning board matters dealing with his property, it is significant that neither he nor any other representative appeared at the 1969 hearings at which the Ibbotson property was rezoned for commercial use. The inference may be drawn from that circumstance that the zoning change was inconsistent with respondent's long-held intentions for development as expressed to appellants, an inference not weakened by the fact that the corporation sought to capitalize on this unexpected zoning windfall after Mr. Kenny's death in 1969. Several maps prepared and used by respondent from as early as 1959 consistently indicate an intention that the Ibbotson property be developed residentially. On those early maps the Ibbotson tract was platted into building lots. Later these lot lines were removed and revised plats prepared, but when this was done the R-2 legend was placed on the map, indicating residential use for that parcel.

This evidence of respondent's intended use of the property at the time of the sales to appellants is bolstered by Mr. Kenny's several statements on the subject to interested and disinterested witnesses. The trial court found as a fact that the representations were made by Mr. Kenny on behalf of respondent corporation (the stock of which was wholly owned by him and his wife), and the oral representations give vitality and substance to the negative easement expressed by the legend on the plat. Thus, in response to direct inquiries about the Ibbotson property by buyers made at the time of their respective purchases, Mr. Kenny told Mr. and Mrs. Huggins that he intended to develop the property on the opposite side of Imperial Drive (the Ibbotson property) with '' a row of houses across the front '' and he assured appellant Lawrence that there would be '' residential building '' across the street. Mr. Walsh, the owner of Lot No. 15, located between the two properties of appellants, carried on a lengthy discussion with Kenny in February, 1969 about the proposed development of the Ibbotson tract across the street and was told that the property would be developed for one-family homes similar to the one then being shown Mr. Walsh. Kenny added that he was not obliged to construct one-family homes and might possibly construct duplex houses similar to other houses in the tract, but there was no suggestion that the Ibbotson property would ever be used commercially. Mr. Walsh's wife was shown the house by Mr. Kenny on an earlier occasion and she was told by him that the vacant land across

the street was to be used for duplex houses. Mr. McEvoy was a real estate broker who had sold property in the development as a cobroker with Kenny. When completing a sale of property on Imperial Drive to people named Shemberger, he asked Kenney about the proposed development across the street and Kenny told him that "they were going to build houses" there.

In the face of all of this largely undisputed evidence, there can be little doubt that the agreement between appellants and respondent contained a restriction on the development of the Ibbotson property, a restriction purposefully imposed to induce the sale of real property on the other side of Imperial Drive. The logic of respondent willingly restricting the development of the Ibbotson property is clear. Without the protection of the R-2 zoning the property subsequently bought by appellants would be less salable and greatly depreciated in value not only because of nonresidential development of the Ibbotson property but also because exposed to visible nonresidential uses located outside of the subdivision. Significantly, the several maps received in evidence concerning the Ibbotson property from 1959 to the date of trial show that parcel either subdivided or else identified with the legend R-2. It should be noted further that the Ibbotson parcel is the only parcel in the entire subdivision as shown on any map in which the residential use is specifically indicated.

These were not representations elicited as a matter of idle curiosity. They were statements by respondent which appellants testified that they requested and relied upon before purchasing the property. In fact, Mr. and Mrs. Huggins had been shown a house in another part of the subdivision by a broker, Mr. Campion, which was almost a duplicate of their present house and they declined to buy it because it was located across the street from an area proposed for commercial development. The trial court in its written decision found as a fact that Kenny made the alleged statements of residential use to appellants and that appellants relied upon them. It tempered these findings by stating that it did not believe that Kenny intended the statements as representations nor could the court believe that appellants relied "solely" upon his statements in purchasing the property, considering the nature of the neighborhood surrounding the subdivision. This qualitative evaluation of appellants' subjective thoughts and motivations may have been pertinent in determining whether the respondent was estopped from commercially developing the Ibbotson property (for a case with similar facts. see *Phillips* v. *West Rockaway Land*

*Co.*, 226 N. Y. 507), but if the statements were made and relied upon, as the trial court found, the minds of the parties met and a binding agreement resulted. The court's concern that the appellants may never have seen the legend on the map before purchase or that a decision favorable to appellants would result in a permanent restriction on the land is irrelevant. Parties are bound by the terms of their agreement whether they see and read it and there is no reason why a person promising a benefit to a proposed purchaser should not be bound to confer it on them after completing the sale. The trial court's description of the various property uses in the area coupled with a finding of extensive commercial use adjacent to respondent's development could not justify nullifying a binding covenant of substantial value to appellants after the parties had agreed to it (*Congregation Khal Chasidim* v. *Congregation Beth El*, 19 A D 2d 622).

In view of respondent's contention that the R-2 zoning legend created no right in appellants, it is interesting to consider the converse situation. It could hardly be argued that the grantees were not bound by the setback restrictions contained in the plat because of less restrictive provisions of the zoning ordinance (cf. *Wischmeyer* v. *Finch*, 231 Ind. 282). Zoning regulations may always be changed, of course, but if, as here, the restrictions are binding on the parties as part of an agreed uniform plan, the contractual rights exist independent of the zoning ordinance. Similarly, this requirement of residential use voluntarily placed upon the Ibbotson property by the grantor prior to sale cannot be altered by subsequent zoning changes. It represents an easement or restriction imposed upon the land by agreement respecting a uniform plan of development for the area[1]. The only distinction between the two situations is that the language of the setback restriction is clear, whereas doubt arises because of the unconventional method of using zoning terminology when referring to the restriction of the Ibbotson tract. Certainly there is nothing inherently improper about this very precise method of describing a restriction and the proof is that it exactly expressed respondent's intention. In our judgment the appellants have satisfied their burden of proving the intention to create a negative easement on the Ibbotson property by a preponderance of the credible evidence

---

1. It is noteworthy that the plat was prepared by an admittedly competent engineer (who was not called as a witness) and it has never been contended by the respondent that the legend was placed on the plat by error or for informational purpose only. In fact, no particular explanation is offered for its presence.

(see 2 Harvey Law of Real Property and Title Closing [Biskind], § 301.10).

The judgment should therefore be reversed and judgment granted in favor of appellants and against respondent enjoining respondent from using the land in question for other than R-2 zoning purposes as permitted by the zoning law in effect in the Town of New Hartford prior to the amendment of 1969.

MOULE, J. (dissenting). In 1968, plaintiff Eric H. Huggins purchased a house from defendant, a developer, in a residential subdivision in the Town of New Hartford, a Utica suburb. In the same year, plaintiff James M. Lawrence purchased a building lot from defendant in the same subdivision. Both parcels of property were zoned R-2 (residential) as was a lot across the road which was owned by defendant and was part of the same subdivision. The area surrounding the subdivision, however, was developed commercially and various commercial structures were in full view of plaintiffs' property.

At the time of their respective purchases, plaintiffs were given deeds which contained no physical description of the conveyed land. Instead, each contained a reference to a numbered lot on a plat map of the subdivision filed with the County Clerk and each also contained a notation that their titles were "subject to all restrictions, covenants, easements and rights of way of record". On the plat map, the boundaries of plaintiffs' lots were clearly delineated as were the boundaries of the lot across the road from theirs. The map also showed that this latter parcel was zoned for residential purposes.

There is some evidence that at the time defendant sold plaintiffs their property, it intended to develop the third parcel with further residential structures in accordance with its zoning restriction and told plaintiffs of its plans. In the following year, however, the Town of New Hartford rezoned the area in which this lot was located from residential to commercial, and defendant contracted to sell it to an automobile dealer for a showroom.

Plaintiffs objected to the sale and commenced an action to enjoin it. They urge that since the plat map, which showed the third parcel to be zoned residential, was incorporated by reference in their deeds and since their conveyances were made "subject to all restrictions, covenants, easements and rights of way of record", the deeds and the plat map must be read together to impose a negative easement over the property in their favor, thereby prohibiting defendant from ever using it for other than residential purposes. Plaintiffs further urge

that defendant is, in any event, estopped from selling the property for commercial use because of the representations it made as to intended future residential development at the time of their purchase.

The trial court, after hearing testimony from 19 witnesses, found that no easement had been created by incorporation of the plat map in the deed and found further that plaintiffs' claim that they relied upon defendant's representations were not substantiated by the evidence so as to warrant application of the equitable principle of estoppel. We agree.

An easement is an interest in land within the meaning of the Statute of Frauds and, therefore, can only be created by written instrument, subscribed by the grantor (*Wiseman* v. *Lucksinger,* 84 N. Y. 31; General Obligations Law, § 5–703). However, the incorporation of a filed plat map in a deed makes the plat map part of the conveyance (*Seamans* v. *Gulf Refining Co.,* 237 App. Div. 202, affd. 264 N. Y. 433) and, in some situations, the grantee may thereby acquire an easement by implication over other lands shown on the map (*White* v. *Moore,* 139 App. Div. 269). Such a rule is often applied under circumstances in which certain areas of the plat map have been clearly designated as parks, squares or beaches for the use of lot owners (*Wilkinson* v. *Nassau Shores,* 1 Misc 2d 917, affd. 278 App. Div. 970, mod. 304 N. Y. 614) but the principle is not absolute and it is the intention of the seller which governs each situation (*Fieder* v. *Terstiege,* 56 N. Y. S. 2d 837, affd. 273 App. Div. 982). Thus, in *White* v. *Moore* (*supra*), it was held that where lots were conveyed with reference to a map showing a park, the grantees acquired an easement in the park because each of their lots fronted on it and its existence was a strong inducement to purchase. But where a lot was conveyed with reference to a map showing merely that an adjacent parcel of land was vacant, no easement by implication arose (*Dalton* v. *Levy,* 258 N. Y. 161) nor did one arise where a map showed a parcel designated as a " 1.0 Reserve Strip " (*Warren* v. *Protano, Inc.,* 155 N. Y. S. 2d 686). It must be shown that the seller unequivocally intended to create an easement in favor of the purchaser (*Roma Development Corp.* v. *Jones,* 115 N. Y. S. 2d 189) and it has often been said that the policy of the law is to favor the free and unobstructed use of property (*Premium Point Park Assn.* v. *Polar Bar,* 306 N. Y. 507; *Baxendale* v. *Property Owners' Assn.,* 138 N. Y. S. 2d 76, affd. 285 App. Div. 1148, affd. 309 N. Y. 871) and is jealous of easements, the burden being on the party asserting one to prove it clearly (*Zeiger* v. *Interborough R. T. Co.,* 254

App Div. 908, affd. 280 N. Y. 516; *Warren* v. *Protano, Inc., supra*).

We think, as did the trial court, that there was no such clear proof that an easement was intended in this case. Here, the plat map did not designate the third lot as a park, a square or a beach but merely reflected an accurate notation of the status of its current zoning classification. A zoning classification is a temporary thing and is always subject to change by a local legislative body in accordance with law. Here, there was nothing apparent on the face of the map to show that defendant, as seller, intended to subject this parcel contractually to any more permanent form of restriction than was imposed by the zoning ordinance. Furthermore, as the trial court pointed out, neither of the plaintiffs placed any reliance upon the provisions of the plat map at the time of their purchases, and there is doubt as to whether either of them ever saw it. By adopting plaintiffs' position, the majority of this court is opening the door to a variety of encumbrances upon parcels of property never intended by those who subdivide and develop real estate. The effect of its decision is to facilitate the freezing of zoning designations appearing on plat maps into easements in favor of nearby or adjacent lot owners and thereby to effectively strip local legislative bodies of a portion of their power to control land use within their jurisdictions via rezoning.

The trial court was correct in finding that there was insufficient evidence on the record to warrant application of an estoppel against defendant based upon representations that might have been made to plaintiffs at the time they purchased their property. The doctrine of estoppel is an equitable principle. Its applicability rests largely on the facts or circumstances of the particular case (*Parsons* v. *Lipe,* 158 Misc. 32, affd. *Parsons* v. *First Trust & Deposit Co.,* 243 App. Div. 681, affd. 269 N. Y. 630). It requires a representation by the party to be estopped inconsistent with a position later taken and also requires that the party seeking to invoke the estoppel has relied on the representation to his detriment (*Rosenthal* v. *Reliance Ins. Co.,* 25 A D 2d 860). Here, the trial court, after hearing the witnesses and observing their demeanor, concluded that, whereas defendant may have represented to plaintiffs at the time of their purchase that it intended to develop the third parcel for residential use, plaintiffs did not place any reliance upon what was said. The court reasoned that plaintiffs could readily see that other property surrounding their location was being developed commercially and had they placed any importance upon the

future residential development of the third lot, they would have sought more formal assurances in the form of a writing. Plaintiffs in this case were not without experience in practical affairs. One was the athletic director of Utica College and the other was an executive of the Marine Midland Bank.

We have the authority to review questions of fact as well as questions of law and we may reverse findings of a trial court when such are against the weight of the evidence. However, our authority is not unlimited and in all cases we must recognize that the Trial Judge, who has seen and heard the witnesses and has opportunity to question them and to guide the course of the trial, has an advantage over the appellate Judge who must reach his conclusion on the written record alone (*People ex rel. MacCracken* v. *Miller,* 291 N. Y. 55). Where, as here, the trial court's conclusions were necessarily based largely upon the credibility of witnesses, its decision should be given great weight (*Amend* v. *Hurley,* 293 N. Y. 587).

The trial court's decision was sound and its judgment should be affirmed.

WITMER and GOLDMAN, JJ., concur with SIMONS, J.; MARSH, P. J., and MOULE, J. dissent and vote to affirm the judgment in an opinion by MOULE, J.

Judgment reversed, on the law and facts, with costs, and judgment granted in favor of appellants in accordance with opinion by SIMONS, J.